**COMMONWEALTH of Pennsylvania,**
**Appellee**

v.

**Jose HERNANDEZ, Appellant.**

Superior Court of Pennsylvania.

Submitted Oct. 24, 2005.

Filed Jan. 23, 2006.

**12**

Ann P. Russavage-Faust, Doylestown, for appellant.

Sean M. Gresh, Asst. Dist. Atty., Doylestown, for Com., appellee.

Before: TODD, JOHNSON, JJ., and McEWEN, P.J.E.

PER CURIAM:

¶ 1 Appellant, Jose Hernandez, brings this appeal from the judgment of sentence to serve a term of imprisonment of from five years to ten years, imposed after a jury found him guilty of one count of pos-session with intent to deliver a controlled substance (marijuana). We are compelled to vacate the judgment of sentence.

¶ 2 The factual history of this appeal commenced on October 21, 2004, in Bensalem Township, Bucks County, Pennsylvania. On that date, appellant was driving a U–Haul truck when he was stopped by Bensalem Township police officers, who had previously received information that appellant was transporting contraband. The truck had both a cab section and a separate cargo section. Once appellant was stopped and removed from the truck, a search was conducted of the cab section, but no contraband or drug paraphernalia was found. Thereafter, Officer Cary Palmer and two other officers, all of the Bensalem Township Police Department, went to the rear of the U–Haul truck, undid the latch on the closed cargo door and opened the cargo section of the truck. When approximately twenty boxes were found in the cargo section, Officer Palmer climbed up into that part of the truck and looked behind the cartons, where, according to his testimony, one of the boxes was broken open, revealing a small parcel wrapped with opaque brown tape. Officer Palmer believed the parcel to be either pre-packaged marijuana or cocaine. As a result of this search and discovery, the officers secured the vehicle and applied for a search warrant authorizing the search of the vehicle and the seizure of any controlled substances and related articles. The ensuing search resulted in the seizure of twenty cartons of marijuana, with an aggregate weight in excess of four hundred pounds. Appellant was thereafter arrested.

¶ 3 Prior to trial, appellant filed a motion to suppress the evidence in which he contended that the police violated his constitutional rights, as established by Article I, § 8 of the Pennsylvania Constitution, by

searching the cargo section of the truck without probable cause. The motion was denied, and the case proceeded to a jury trial. The jury convicted appellant, and this appeal followed.

¶ 4 Appellant, in the brief submitted in support of this appeal, presents the following questions for our review:

Whether the trial court erred in concluding that the police officers were justified in searching the cargo compartment of the truck in which the contraband was found?

Whether the trial court erred in concluding that the search of the truck was founded upon a valid warrant issued upon probable cause?

As these issues are inextricably linked, we will discuss them jointly.

¶ 5 When a defendant seeks to suppress evidence, the burden is on the Commonwealth to establish by a preponderance of the evidence that the challenged evidence is admissible. *See:* Pa. R.Crim.P. 581(H). Furthermore,

while reviewing the ruling of a suppression court, our role is limited to determining whether the factual findings are supported by the record, *Commonwealth v. DeWitt,* 530 Pa. 299, 301, 608 A.2d 1030, 1031 (1992), and whether the legal conclusions drawn from those facts are correct.

*Commonwealth v. Labron,* 543 Pa. 86, 93, 669 A.2d 917, 920 (1995), *reversed on other grounds,* 518 U.S. 938, 116 S.Ct. 2485, 135 L.Ed.2d 1031 (1996), *reaffirmed and reinstated,* 547 Pa. 344, 690 A.2d 228 (1997).

¶ 6 The legal conclusion at issue in this case is the trial court ruling that the police were permitted to conduct a warrantless search of the cargo section of the truck in which appellant was traveling. Since this determination raises a pure question of law, the ruling of the trial court is subject to *de novo* review without regard to the deference that would normally be accorded to findings of facts. *See, e.g.: Commonwealth v. Whitmyer,* 542 Pa. 545, 668 A.2d 1113 (1995).

¶ 7 The law is well established in Pennsylvania that searches following a vehicle stop require both probable cause and exigent circumstances to survive scrutiny under the Pennsylvania Constitution:

[A]bsent an exigency ... there is no justifiable search [of a vehicle] incident to arrest under the Pennsylvania Constitution save for the search of the person and the immediate area which the person occupies during his custody. ...

*Commonwealth v. White,* 543 Pa. 45, 57, 669 A.2d 896, 902 (1995) (footnotes omitted). Since 1995 this Court has been called upon to apply the *White* standard in a variety of factual circumstances, the following of which are relevant to the present matter:

— In *Commonwealth v. Rosenfelt,* 443 Pa.Super. 616, 662 A.2d 1131 (1995), *appeal denied,* 544 Pa. 605, 674 A.2d 1070 (1996), this Court held that even though the defendant's parole officer had probable cause to search the defendant's trunk, "[b]ecause the car was in the control and dominion of the officers, and no discernible exigency was present, *the warrantless search violated Article 1, Section 8, of the Pennsylvania Constitution.*" *Id.* at 647–648, 662 A.2d at 1146 (emphasis supplied).

— In *Commonwealth v. Haskins,* 450 Pa.Super. 540, 677 A.2d 328 (1996), *appeal denied,* 547 Pa. 751, 692 A.2d 563 (1997), this Court held that the warrantless search of an automobile from which the defendant had fled violated the defendant's constitutional rights as guaranteed under the Pennsylvania Constitution.

— In *Commonwealth v. Gelineau*, 696 A.2d 188, 192 (Pa.Super.1997), *appeal denied*, 550 Pa. 699, 705 A.2d 1305 (1998), this Court held that although the police had probable cause to detain the defendant, they were nonetheless required to obtain a warrant prior to searching the engine compartment of the vehicle in which he was traveling.

— In *Commonwealth v. Casanova*, 748 A.2d 207 (Pa.Super.2000), *appeal denied*, 570 Pa. 682, 808 A.2d 569 (2002), this Court held that even though an undercover police officer had witnessed drug activity taking place in the car, once the defendant's vehicle was under the supervision of the police and the defendant had been removed from the car, a warrant was required.

The Commonwealth here seeks to avoid the clear import of these cases by relying on the plurality decision of the Pennsylvania Supreme Court in *Commonwealth v. Perry*, 568 Pa. 499, 798 A.2d 697 (2002), which finds a divided Court upholding the warrantless search of an automobile. However, a careful study of the Court's decision in *Perry* does not justify the Commonwealth's conduct in this case.

¶ 8 In *Perry*, the defendant, Shawney Perry, and his co-defendant, Brett Stewart, were riding in a white Lexus automobile that had been described to police as the source of a gun shot that had been fired into another vehicle, a GEO Tracker. A passenger in the GEO tracker was wounded by the gun shot. As summarized by the lead opinion of the Court, the following events transpired following the shooting:

Jones [the driver of the GEO] drove around the block in an effort to seek help. Jones flagged down Philadelphia Police Officer Tyrone Forrest, who was on duty outside of Illusions. Officer Forrest observed the bullet hole in the side of the Tracker and noted blood on the seat. After summoning an ambulance, Officer Forrest broadcasted an alert over police radio at 2:59 a.m., stating that a man had been shot and that his assailants were two black males who had driven southbound on 8th Street in a two-door white Lexus.

Officer John Barker received the police broadcast. Approximately one minute later, he observed Perry and Stewart in the white Lexus which was proceeding south on 8th Street. Barker requested back up and followed. Officer Barker and Sergeant Glenn Katz, who had joined in the pursuit, ultimately stopped the men near the intersection of 11th and Federal Streets. The Lexus was blocking one of two southbound lanes of 11th Street.

The officers directed Perry and Stewart out of the car. The officers did not request that Perry turn off the engine, and thus, the motor remained running. The police frisked the men as a safety precaution but no weapons were found on their persons. The police took Jones to the stopped vehicle in an attempt to identify the assailants. Jones arrived within fifteen minutes after Officer Forrest had reported the shooting over the radio.

Upon seeing Perry and Stewart, Jones immediately exclaimed, "that's them and they have two guns." At that point, Perry and Stewart were handcuffed and placed in police vehicles. Jones informed police that at least one of the guns appeared to be an "automatic" weapon. This information was relayed to Lieutenant Thomas McDevitt who had arrived on the scene. Determining that as a matter of public safety it was imperative for the guns to be recovered, Lieutenant McDevitt requested that Of-

ficer Barker search the Lexus for the weapons.

Officer Barker returned to the vehicle and shined a flashlight into the passenger compartment. He noticed that the floor mat on the driver's side was askew. Concerned that one of the guns may be lying beneath the mat, Officer Barker lifted the mat and uncovered a 9mm Helwan, loaded with six bullets. Officer Barker then searched under the passenger side floor mat and uncovered a .22 Beretta. Once the weapons were removed, the Lexus was driven to police headquarters. No other search was made of the vehicle, and the vehicle was immediately driven to an impoundment area.

*Id.* at 501–502, 798 A.2d at 698–699.

¶ 9 Upon this record, the Supreme Court issued four separate Opinions, none of which garnered a sufficient number of votes to constitute a Majority Opinion. Mr. Justice Ralph Cappy, now the esteemed Chief Justice, in the lead Opinion, which was joined by then Chief Justice John Flaherty, opined that pursuant to the landmark opinion in *Commonwealth v. White, supra,* there exists a "police danger" exception to the Pennsylvania constitutional warrant requirement, which he described as follows:

> [W]hen police are faced with a situation that they did not create, which necessitates that they enter an automobile, and they possess specific and articulable facts from which they reasonably believe that there exists a great potential for deadly harm, the police may conduct a limited search of the vehicle to ensure their safety.

*Commonwealth v. Perry, supra* at 509, 798 A.2d at 703.

¶ 10 Mr. Justice Thomas Saylor, in his Concurring Opinion, also relied upon the *White* decision, but did not embrace Justice Cappy's "police danger" exception. Instead, he limited his discussion to the facts of the case, and concluded that those facts compelled the conclusion that "sufficient exigency [was] present where, because of the attending circumstances, it was not reasonably practicable for the police to obtain a warrant." *Id.* at 537, 798 A.2d at 720. The germane facts upon which he relied were:

> [T]he police did not receive information concerning the shooting sufficiently in advance to secure a warrant, the vehicle was situated in the middle of the street and running, ... given the concern for locating loaded firearms before moving the vehicle or ordering a search of the surrounding area, it was not reasonably practicable to obtain a warrant ... [and] the scope of the search was limited to the exigency justifying its instigation, namely the seizure of the loaded firearms.

*Id.* at 538, 798 A.2d at 720.

¶ 11 Mr. Justice Ronald Castille, however, in the Concurring Opinion that was joined by Madam Justice Sandra Newman, proceeded from a fundamentally different analytical threshold than the other Justices, since he opined that the law of Pennsylvania did not and should not have an exigency requirement. *Id.* at 515–536, 798 A.2d at 706–719.

¶ 12 Finally, in his Dissenting Opinion, Mr. Justice Russell Nigro, who was joined by Mr. Justice Stephen Zappala, disagreed with the conclusion that any exigency existed, and emphatically disagreed with the creation of a "police danger" exception to the warrant requirement "based merely on the potential for danger." *Id.* at 543, 798 A.2d at 724. The dissenters further opined that the existence of such an exception would "swallow" the vehicle warrant rule, and allow "police virtually unfettered

discretion to invoke the mantra of 'police danger' as a pretext to searching vehicles without a warrant." *Id.* at 544, 798 A.2d at 724.

¶ 13 Therefore, although the Justices could not reach a majority on whether Pennsylvania should recognize a broad "police danger" exception to the warrant requirement, five of the Justices *reaffirmed* the *White* decision as the prevailing statement of the law of the Commonwealth. Application of that decision, and its progeny, to the facts of this case, compels us to the conclusion that the warrantless search of the cargo section of the truck in which appellant was traveling constituted a clear and certain violation of appellant's rights as guaranteed by the Pennsylvania Constitution. *See: Commonwealth v. Casanova, supra; Commonwealth v. Gelineau, supra; Commonwealth v. Haskins, supra; Commonwealth v. Rosenfelt, supra.*

¶ 14 We further observe that even under the *police danger exception* espoused by the plurality in *Perry,* the facts of this case would not support its application. In expressing the view that such an exception existed, Justice Cappy relied upon the following language from *White:*

> We do not propose to invalidate warrantless searches of vehicles where the police must search in order to avoid danger to themselves or others, as might occur in the case *where police had reason to believe* that explosives were present in the vehicle.

*Commonwealth v. White, supra,* 543 Pa. at 57 n. 5, 669 A.2d at 902 n. 5 (emphasis supplied). He then enunciated a standard which would permit a warrantless search if the police "possess specific and articulable facts from which they *reasonably believe* that there exists a great potential for deadly harm." *Commonwealth v. Perry, supra* at 509, 798 A.2d at 703 (emphasis

supplied). Thus, as envisioned by the plurality, the application of such an exception would be contingent upon the police having "reason to believe" that explosives or some other immediately dangerous objects are in the area to be searched. Here, however, the Commonwealth produced no evidence that would support such a conclusion, and, in fact, the suppression hearing evidence supported a contrary conclusion. That evidence consisted of the testimony of one witness, Officer Cary Palmer, the arresting officer, who testified in relevant part:

[COMMONWEALTH COUNSEL]: Where did you come in contact with this U–Haul [truck]?

[OFFICER PALMER]: I came in contact with the U–Haul, I was on State Road in Bensalem Township, I was heading southbound and I was making a left-hand turn into Yellow Freight, and when I was making a left-hand turn I observed a U–Haul truck making a right-hand turn out, heading northbound on State Road.

[COMMONWEALTH COUNSEL]: What information had you received about a U–Haul truck?

[OFFICER PALMER]: I received information that there was a U–Haul truck with Arizona license plate[s] and there was *a Hispanic male* as the driver of the vehicle.

[COMMONWEALTH COUNSEL]: What information did you receive about the contents of the truck?

[OFFICER PALMER]: I received information that it was [sic] a large amount of marijuana.

\* \* \* \*

[COMMONWEALTH COUNSEL]: Who did you get this information from that there was marijuana in the truck?

[OFFICER PALMER]: Officer Reilly, who's a Bensalem Township police officer.

[COMMONWEALTH COUNSEL]: Where did he get it from?

[OFFICER PALMER]: He got the information from I believe it was Joe Purcell from Yellow Freight.

[COMMONWEALTH COUNSEL]: You had information that Mr. Purcell examined these packages.

[OFFICER PALMER]: Yeah, I had information that it was opened and inside one of the packages was what he [Purcell] believed to be marijuana.

* * * *

[ON CROSS EXAMINATION]:

[DEFENSE COUNSEL]: Did Officer Reilly tell you he spoke to Mr. Purcell directly?

[OFFICER PALMER]: I'm not ... I'm not sure. He said the information, he got information from an employee from Yellow Freight, and after the incident I went down to Yellow Freight and I talked to Mr. Purcell, who told me he was in touch with an officer.

[DEFENSE COUNSEL]: Did Mr. Purcell also indicate that he had contacted the state police and the DEA?

[OFFICER PALMER]: I believe he— yes, he said he contacted, I forget the gentleman's name, he's on the Pennsylvania State Police assigned to the DEA task force, because he was unaware that the Bensalem Township Police Department had a narcotics unit.

[DEFENSE COUNSEL]: *When you first received information it was your understanding that the truck was still at Yellow Freight; is that correct?*

[OFFICER PALMER]: *Yes, sir.*

[DEFENSE COUNSEL]: And in fact nothing had been loaded inside the truck at that time?

[OFFICER PALMER]: No, it was at Yellow Freight. *At the time I didn't know exactly if it was loaded. I believe nothing was loaded at the time I got the information.*

[DEFENSE COUNSEL]: And Mr. Purcell was actually instructed from your department to load the truck?

[OFFICER PALMER]: I don't know if he was instructed to load it. *I know that when I was there I told the other officers that I wanted to make sure the truck was loaded.*

[DEFENSE COUNSEL]: And you wanted to make sure that Mr. Hernandez was driving it?

[OFFICER PALMER]: I'm sorry, can you repeat that?

[DEFENSE COUNSEL]: *You wanted to make sure Mr. Hernandez was driving it, correct.*

[OFFICER PALMER]: *A male, yeah. I didn't know who it was. Make sure somebody was in there and it was loaded, yes.*

[DEFENSE COUNSEL]: How long before the stop was made on the truck did you receive the information from Officer Reilly?

[OFFICER PALMER]: Initially received the information?

[DEFENSE COUNSEL]: Yes.

[OFFICER PALMER]: I guess I initially received it maybe 20 to 30 minutes prior. I was at headquarters in my office doing some work. They were trying to get in touch with me, so I didn't exactly look at a clock. I'm guessing approximate time.

[DEFENSE COUNSEL]: And the other officers were set up at a perimeter around Yellow Freight; is that correct?

[OFFICER PALMER]: Yes.

N.T. March 8, 2005, pp. 7–15.

¶ 15 Thus, the evidence produced by the Commonwealth supports the singular conclusion that the U–Haul truck, which was loaded on the site of the freight company under the auspices of persons with whom the police were in contact, was operated by appellant alone.[1] Therefore, there was no basis to support a conclusion that the police had "reason to believe" that another person may have been hiding in the cargo section of the truck,[2] and no basis upon which to support a warrantless search of that section.

■ ¶ 16 In light of our conclusion that the warrantless entry into the cargo section of the U–Haul truck was a violation of appellant's rights under the Pennsylvania Constitution, we turn our attention to the search warrant that was subsequently issued, so as to determine whether sufficient information was provided to support its issuance, and thereby authorize the ensuing search of the boxes.

¶ 17 The warrant in this case was issued upon an affidavit that contained the following operative language:

1. Since it is clear beyond peradventure that the police in this case were in possession of information regarding the existence of a significant amount of contraband prior to it being loaded onto the truck, the failure of the police to confirm the information with an eye toward obtaining a warrant prior to stopping the truck borders on inexplicable. *See generally: Commonwealth v. Coleman*, 574 Pa. 261, 830 A.2d 554 (2003) (permitting the issuance of anticipatory search warrants).

2. The trial judge sought to justify the search of the cargo section upon the following rationale:

   While it is true that there is nothing in the information that was received from Mr. Purcell by way of Officer Reilly which tended to establish that the defendant had some-

Whereas, on 10/21/04 at approximately 1043 HRS Joseph Purcell, the Operations Manager of Yellow Freight 2627 State Road, Bensalem, PA 19020, contacted the Bensalem Township Police Department regarding suspicious packages being picked up. Joseph Purcell stated that a [H]ispanic male had arrived to pick up a pallet of approximately 20 boxes and had been acting suspicious and nervous, and that the [H]ispanic male had paid $2,283.83 in U.S. currency. The package was shipped COD, which was suspicious to Mr. Purcell. The [H]ispanic male was unaware that he had to pay the $2,283.83 and went outside returning with the $2,283.83 approx. 1/2 hour later. *Mr. Purcell had opened one of the approximately 20 boxes and observed a package in the box that he believed to be marijuana wrapped in plastic wrap. Mr. Purcell was confident that the item in the opened box was some type of controlled substance.*

Members of the Bensalem Township Police Department established a perimeter and waited until the [H]ispanic male took possession of the approximately 20 boxes, having them loaded into the back one accompanying him, certainly none of the information which the officers had excludes that possibility.

N.T. March 8, 2005, p. 39. *See also:* Trial Court Opinion, June 24, 2005, p. 4. This analysis, however, which would permit a search upon mere speculation or subjective belief, impermissibly places the burden to show a lack of danger on the party who seeks to protect his or her constitutional rights, rather than on the Commonwealth to support the reasonableness of its belief that danger was present. "This is not the correct standard and ... places an onerous burden upon [a challenger] to prove a negative." *Commonwealth v. Brown*, 836 A.2d 989, 996 (Pa.Super.2003), *affirmed*, 582 Pa. 573, 873 A.2d 1275 (2005).

of a rented U–Haul box truck. The police officers converged on the [H]ispanic male, the lone occupant of the U–Haul truck. The [H]ispanic male was identified as Jose M. Hernandez Jr. DOB: 12/28/71. Hernandez had in his possession printed out directions from Yahoo Maps, specifically directions from the Philadelphia International Airport to Yellow Freight, and a second set of directions from Yellow Freight to 831 Walnut Street in Reading, PA. Hernandez also possessed a cellular telephone. During the investigation your Affiants learned that Jose Hernandez had flown in to Philadelphia Airport from Los Angeles California at 9:50 PM on 10/21/04 (Pacific Standard Time), arriving in the early AM hours on 10/21/04. Hernandez then rented room # 107 at the Sleep Inn 3427 Street Road, Bensalem, PA 19020, paying cash. Hernandez was accompanied by two unidentified [H]ispanic males when he checked into the room. At 9:42 AM Hernandez rented a U–Haul truck paying $284.52 in cash. Hernandez arrived at the Yellow Freight 2627 State Road, Bensalem, PA 19020. The package [sic] with the approximately 20 boxes was loaded into the U–Haul truck. Whereas, your Affiants are familiar with the fact through their training and experience that people involved in the illicit possession and distribution of controlled substances pay for everything in cash, as drug dealing is a cash business generating vast amount[s] of U.S. currency. Whereas, the U–Haul truck had an Arizona registration plate: AB02180, bearing VIN: 1FDKF37G2VEB24093. *Police Officer Palmer, Smith and Det. Gross observed in the back of the U–Haul rental truck a pallet containing approximately 20 cardboard boxes, one of which had been opened. The Officers were checking to ensure that there were no persons hiding in the back of the U–Haul that could pose a threat to the Officers' safety as well as their own. Det. Gross has made hundreds of narcotics related arrests, has recovered controlled substances hundreds of times, and has attended hundreds of hours of specialized narcotics training. Det. Gross observed a package inside of the opened box that he described as rectangular with rounded edges, $1\frac{1}{2}$—2 feet long and several inches thick, wrapped in plastic wrap and tape. Det. Gross through his training and experience recognized the packaging as being consistent with packaging that has been recovered in the past containing controlled substances. It is Det. Gross' opinion that the package contained controlled substances.*

Whereas, Hernandez was interviewed at police headquarters by Sgt. Barry and D.E.A. Agent Bleier. Hernandez stated that this was the first time he had done this, and that he was paid $1,000.00 to fly out to Philadelphia from Los Angeles, California to pick-up the shipment at Yellow Freight. Hernandez was supposed to call someone who he refused to identify and transfer the U–Haul and shipment it contains somewhere on the way to Reading. Hernandez was to get detailed instructions when he placed the call. Hernandez refused to give names and certain specifics stating that he had 5 children and family and that he feared for their lives if he gave specifics. Hernandez stated that someone else had paid for his plane ticket. Hernandez stated that he knew the boxes contained controlled substances, either marijuana or cocaine, believing it was probably cocaine.

Whereas, Officer David Weiser, K–9 certified Police Officer with Bristol Township Police Department, utilizing his

narcotics detector certified K–9 Rommel, conducted a search of the exterior of the vehicle for the presence of the odor of controlled substances. K–9 Rommel gave a positive indication for the presence of the odor of controlled substances at the rear/tail roll-up door of the U–Haul.

Whereas, Hernandez stated that he had one prior arrest for possession of cocaine in California.

Whereas, the U–Haul truck has been seized and has been in police custody since the time that it was stopped after having exited the parking lot of Yellow [F]reight. A Police Officer has maintained constant visual surveillance of the U–Haul.

Whereas, based on the information contained within this Affidavit of Probable Cause, your Affiants have established probable cause exists to believe that the U–Haul contains approx. 20 boxes that contain controlled substances, and request the issuance of the accompanying search warrant to secure evidence of violations of ACT 64.

Affidavit of Probable Cause, October 21, 2004 (emphasis supplied).

¶ 18 The standard for determining whether probable cause existed for the issuance of a search warrant is the "totality of the circumstances test." *Commonwealth v. Gray*, 509 Pa. 476, 503 A.2d 921 (1985), *cited with approval* in *Commonwealth v. Torres*, 564 Pa. 86, 96, 764 A.2d 532, 537 (2001). In making this determination we must confine our inquiry to the four corners of the affidavit submitted in support thereof, and decide whether the issuer had a "substantial basis for concluding that probable cause existed." *Commonwealth v. Edmunds*, 526 Pa. 374, 382

n. 3, 586 A.2d 887, 891 n. 3 (1991) (citation omitted). If, however, a warrant was obtained "through exploitation of illegal police conduct" we must consider "whether, **absent the information** obtained through the illegal activity,[3] probable cause existed to issue the warrant." *Commonwealth v. Shaw*, 476 Pa. 543, 554, 383 A.2d 496, 502 (1978) (emphasis supplied), *citing Commonwealth v. Knowles*, 459 Pa. 70, 327 A.2d 19 (1974). *See: Commonwealth v. Clark*, 412 Pa.Super. 92, 602 A.2d 1323 (1992), *appeal denied*, 533 Pa. 606, 618 A.2d 398 (1992), *cert. denied*, 507 U.S. 1030, 113 S.Ct. 1846, 123 L.Ed.2d 470 (1993) (addressing intentional material misstatements of fact). *See also: Commonwealth v. Yerger*, 333 Pa.Super. 501, 482 A.2d 984, 990 (1984), *appeal dismissed*, 518 Pa. 465, 544 A.2d 446 (1988).

¶ 19 The information to be excluded from consideration in this case is that which was obtained by the police upon their unauthorized entry into the cargo section of the U–Haul truck. This includes the police observations of what they believed to be packaged contraband and, most importantly, the opinion evidence of Detective Gross that "the packages contained controlled substances." The significance of this opinion evidence cannot be overstated since prior to the unauthorized entry into the cargo section of the truck the only other person who was familiar with the contents of the boxes was Mr. Purcell, and the affidavit is silent as to Mr. Purcell's familiarity or lack of familiarity with drugs or drug packaging. Moreover, there is nothing contained in the affidavit to support Purcell's subjective belief that the boxes contained contraband. Consequently, absent the illegally obtained infor-

---

**3.** *See generally: Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

mation, the warrant was issued upon insufficient evidence and we are, therefore, compelled to reverse the ruling of the trial court on this issue.

¶ 20 In light of our decision that the trial court erred in refusing to grant appellant's motion to suppress, the evidence presented against appellant at trial was admitted in contravention of his rights as guaranteed under the Pennsylvania Constitution. Consequently, his conviction of possession with intent to deliver a controlled substance cannot stand.

¶ 21 Judgment of sentence vacated. Case remanded for proceedings consistent with this Opinion. Jurisdiction relinquished.