*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 12-CM-523

LEE CARRELL, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(DVM-134-12)

(Hon. Heidi M. Pasichow, Trial Judge)

(Argued En Banc January 26, 2016    Decided August 3, 2017)

*Fletcher P. Thompson* for appellant.

*John P. Mannarino*, Assistant United States Attorney, with whom *Channing D. Phillips*, United States Attorney, and *Elizabeth Trosman*, Assistant United States Attorney, were on the brief, for appellee.

*Shilpa S. Satoskar*, with whom *Samia Fam* and *Jaclyn S. Frankfurt* were on the brief, for Public Defender Service, *amicus curiae*, in support of appellant.

*Joan S. Meier*, *Bruce A. Ericson* (admitted pro hac vice), *Christine Scheuneman* (admitted pro hac vice), *Julia E. Judish*, *Kristen Baker*, and *Stephen Asay* were on the brief for *amici curiae* Domestic Violence Legal Empowerment and Appeals Project, D.C. Coalition Against Domestic Violence, D.C. Volunteer Lawyers Project, National Network to End Domestic Violence, and Network for Victim Recovery of D.C., in support of appellee.

Before BLACKBURNE-RIGSBY, *Chief Judge*; GLICKMAN, FISHER, THOMPSON, BECKWITH, and EASTERLY, *Associate Judges*; and WASHINGTON, *Senior Judge*.[*]

Opinion for the court by *Associate Judge* EASTERLY.

Opinion by *Associate Judge* THOMPSON, concurring in part and dissenting in part, at page 33.

EASTERLY, *Associate Judge*: We return to this case, sitting en banc, to determine what, if anything, the government must prove vis-à-vis a defendant's mens rea, or state of mind, in order to obtain a conviction for threats (misdemeanor or felony).[1] Our threats statutes do not give us much guidance; neither expressly includes a requisite culpable mental state. And in the wake of this statutory silence, we developed two strands of case law: one indicating that the government had an obligation to prove the defendant "intended" to utter the words as a threat, and the other indicating that it did not. A division of this court considered the split in our precedent and resolved that the latter branch of our case law was binding precedent. *See Carrell v. United States*, 80 A.3d 163, 170–71 (D.C. 2013). We now hold that the government must prove the defendant's mens rea to utter the

---

[*] Chief Judge Blackburne-Rigsby was an Associate Judge at the time of argument. Her status changed to Chief Judge on March 18, 2017. Judge Washington was Chief Judge at the time of argument. His status changed to Senior Judge on March 20, 2017.

[1] D.C. Code § 22-407 (2001) (misdemeanor threats); D.C. Code § 22-1810 (2001) (felony threats). The elements of these offenses are nearly identical, *In re S.W.*, 45 A.3d 151, 155 n.9 (D.C. 2012); *see also infra* note 6; the only difference is in the penalty.

words as a threat, and that it may do so by establishing that the defendant acted with the purpose to threaten or with knowledge that his words would be perceived as a threat.

## I. Facts and Procedural History

Lee Charles Carrell was charged with one count of assault and one count of attempted threats; he pled not guilty and received a bench trial. To prove its case, the government relied primarily on the testimony of the complainant, Mr. Carrell's ex-girlfriend at the time of trial. (On the date of the alleged incident, the two were in the process of ending their relationship but were still living together.) The complainant testified that Mr. Carrell returned home in the early morning hours. They argued. Eventually, "it just subdued," and they went to bed in different rooms. The following morning, however, they resumed fighting. The complainant testified that, in the midst of their argument, Mr. Carrell grabbed her, put both of his hands around her neck "with pressure,"[2] and pushed her against the bedroom window. While doing so, Mr. Carrell yelled at her, "I could fucking kill you, I could kill you, I could kill you right now if I wanted to." The complainant testified

---

[2] The complainant demonstrated to the court that Mr. Carrell "was choking [her] with both hands—the thumbs on the front overlapped part of the neck."

that she thought he was going to kill her. After some period of time, perhaps as long as a minute, Mr. Carrell let the complainant go. But after the complainant told Mr. Carrell that he was "sick" and "needed help," he attacked her again, this time pushing her to the ground, pinning her arms against her sides and putting his hands over her nose and mouth. The complainant testified that, eventually, she was able to get free and called 911.

Mr. Carrell testified in his own defense and disputed the complainant's account of this incident.[3] He denied being physically violent with the complainant or saying to her, "I could fucking kill you right now if I wanted to."[4] He testified that the complainant had initiated the argument with him that morning; that when he "refused to pay attention to her," she grabbed him and kicked him; and that he only engaged with her to get away. He testified that she then accused him of hurting her, threatened him with arrest and the loss of custody of his daughter, and called 911. He had waited for the police to arrive because he "had nothing to hide"

---

[3] Before he took the stand, Mr. Carrell unsuccessfully moved for a judgment of acquittal (MJOA) "on the record" at the close of the government's evidence. Mr. Carrell renewed his MJOA at the close of the defense case and prior to closing arguments.

[4] Mr. Carrell admitted "blurt[ing] out in anger" that he hated the complainant and wished she were dead. But he denied he had "an intention" in making that statement and asserted that he was simply "very upset."

and "wanted to tell his side of the story." On cross-examination, he admitted that he had, during previous arguments with the complainant, thrown and torn pages out of books, pulled a chandelier partially out of the ceiling, and broken a vase, a cabinet door, and the French doors in the apartment.

After instructing herself as to the elements of each offense charged,[5] the trial judge rendered her verdict. The court credited the complainant's testimony "in its entirety," discredited Mr. Carrell's testimony, and found Mr. Carrell guilty of assault and attempted threats. As to the latter charge, the court determined that the government had to prove beyond a reasonable doubt "that Mr. Carrell spoke words or otherwise communicated to the complaining witness words [that] would cause a person reasonably to believe that he or she would be . . . harmed[6] if the event occurred" and "that he intended to utter the words which constituted the threat." The court did not acknowledge any obligation to determine whether Mr. Carrell in

---

[5] We commend the trial court on taking this deliberate step. A review of the pertinent elements on the record not only promotes the trial court's careful review of the evidence but also facilitates this court's review on appeal.

[6] The trial court said "seriously harmed," but as we recently held in *Lewis v. United States*, 138 A.3d 1188 (D.C. 2016), "the crime of misdemeanor threats does not require proof that a defendant threatened '*serious* bodily harm,' as opposed to 'bodily harm.'" *Id.* at 1194.

fact intended to threaten the complainant,[7] and it noted that his subsequent apology to the complainant was "an indicia that Mr. Carrell reacted under these circumstances understandably frustrated . . . that [the complainant] could not control herself orally in terms of her argument and the timing of it." The court determined that the government had met its burden by proving that Mr. Carrell "utter[ed] words to [the complainant] in his anger," specifically "I could kill you, I could kill you. I could fucking kill you right now."

Mr. Carrell challenged his attempted threats conviction on sufficiency grounds, arguing that the trial court "fail[ed] to make a finding as to his intent when he uttered the words which [the trial court] found constituted a crime." A division of this court acknowledged a split of authority in our case law regarding the government's obligation to prove a defendant's "intent" to threaten, but determined that, per *M.A.P. v. Ryan*, 285 A.2d 310 (D.C. 1971), the line of cases eschewing such a mens rea element was controlling. *Carrell*, 80 A.3d at 169–70. Over a dissent from Judge Schwelb, *id.* at 171–77, a division of this court affirmed,

---

[7] The government, however, had argued in closing that Mr. Carrell "had the intent to threaten" the complainant. The defense in response argued not only that he had not said the words the government attributed to him, but also that what he did say—"I wish you were dead"—manifested only that he was "totally and royally sick of [the complainant]."

*id.* at 171. Mr. Carrell then filed a petition for en banc review, which the full court granted. *Carrell v. United States*, No. 12-CM-523, 2015 WL 5725539 (D.C. June 15, 2015) (per curiam order).

## II.     The Law of Threats

We are confronted with a question of statutory interpretation: How should we read the District of Columbia's threats statutes, neither of which defines the elements of the crime, much less addresses what, if any, mens rea the government must prove as to each element? The misdemeanor threats statute, D.C. Code § 22-407, dating back to 1912,[8] contains no description of the crime at all; it merely sets the penalty:

> Whoever is convicted in the District of threats to do bodily harm shall be fined not more than the amount set forth in § 22-3571.01 or imprisoned not more than 6 months, or both, and, in addition thereto, or in lieu thereof, may be required to give bond to keep the peace for a period not exceeding 1 year.

---

[8] Act of July 16, 1912, Pub. L. No. 62-226, ch. 235, § 2, 37 Stat. 192, 193.

The felony threats statute, D.C. Code § 22-1810, passed in 1968[9] and patterned on a federal statute, 18 U.S.C. § 875 (c) (1994),[10] is similarly vague about what exactly the government must prove to obtain a conviction. It states:

> Whoever threatens within the District of Columbia to kidnap any person or to injure the person of another or physically damage the property of any person or of another person, in whole or in part, shall be fined not more than the amount set forth in § 22-3571.01 or imprisoned not more than 20 years, or both.

The "phrasing" of these statutes is "hardly ideal."[11] *United States v. Baish*, 460 A.2d 38, 41 (D.C. 1983). But over the years this court has addressed any vagueness concerns by carving out a defined actus reus, i.e., the act made

---

[9] Act of June 19, 1968, Pub. L. No. 90-351, tit. X, § 1502, 82 Stat. 197, 238–39.

[10] *See Ruffin v. United States*, 76 A.3d 845, 855 n.14 (D.C. 2013) (citing *Holt v. United States*, 565 A.2d 970, 973–74 (D.C. 1989) (en banc)).

[11] "[I]n our free society," it is critical "that every individual going about his ordinary affairs have confidence that his government cannot adjudge him guilty of a criminal offense without convincing a proper factfinder of his guilt with utmost certainty." *In re Winship*, 397 U.S. 358, 364 (1970). "[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt *of every fact necessary to constitute the crime with which he is charged*," *id*. (emphasis added), which means that crimes must be defined with sufficient precision to allow determination of which facts are necessary, *see United States v. Williams* (*Michael*), 553 U.S. 285, 304 (2008) (observing that due process is violated if an individual is convicted under a statute that "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement").

punishable by this crime.[12] Specifically, we have said that, in order to obtain a conviction, the government must prove a conduct element and a result element[13]: that the defendant (1) "uttered words[14] to another person" (2) with a result that "the ordinary hearer [would] reasonably . . . believe that the threatened harm would take place." *In re S.W.*, 45 A.3d 151, 155 (D.C. 2012); *see also Clark (Harold) v. United States*, 755 A.2d 1026, 1030 (D.C. 2000) (acknowledging these two actus

---

[12] Ordinarily, this court looks to the legislature to set forth the basic actus reus elements it wishes to criminalize. *Staples v. United States*, 511 U.S. 600, 604 (1994) ("[T]he definition of the elements of a criminal offense is entrusted to the legislature . . . ."). An exception is made when the legislature codifies common law crimes. *See Carter v. United States*, 530 U.S. 255, 267 n.5 (2000) (noting that "Congress could have simply punished 'robbery' or 'larceny' as some States have done . . . thereby leaving the definition of these terms to the common law"); *see also Sekhar v. United States*, 133 S. Ct. 2720, 2724 (2013) ("It is a settled principle of interpretation that, absent other indication, Congress intends to incorporate the well-settled meaning of the common-law terms it uses." (internal quotation marks omitted)); *Williams (Antwan) v. United States*, 887 A.2d 1000, 1002–04 (D.C. 2005) (importing the elements of common law assault to interpret D.C. Code § 22-404 (a)). Notwithstanding our statement to the contrary in *Postell v. United States*, 282 A.2d 551, 553 (D.C. 1971), both the United States Attorney's Office and the Public Defender Service assert criminal threats was a common law crime, and no one has argued that we are without authority to define the elements of our threats statutes.

[13] We adopt these classifications from the Model Penal Code § 1.13 (9) (Am. Law Inst., Proposed Official Draft 1962) (classifying elements as "conduct," "circumstances," or "results"); *see also Jones (Richard) v. United States*, 124 A.3d 127, 130 n.3 (D.C. 2015) (referring to "material element[s]" as "conduct, resulting harm, [and] . . . attendant circumstance[s]").

[14] This includes written threats. *Tolentino v. United States*, 636 A.2d 433, 434–35 (D.C. 1994).

reus elements); *Baish*, 460 A.2d at 42 (same); *Postell v. United States*, 282 A.2d 551, 553 (D.C. 1971) (same).

This leaves the question of the requisite mens rea for the crime of threats—what courts have often, imprecisely, referred to as the question of "intent." The Supreme Court recently considered in *Elonis v. United States*, 135 S. Ct. 2001 (2015), what proof of mental state the federal threats statute, 18 U.S.C. § 875 (c), requires. Relying on basic principles of statutory construction in the criminal law context, the Court determined that the federal threats statute—also silent on the subject of mens rea—necessitates proof of mens rea with respect to both its conduct and result elements, and endorsed purpose or knowledge for the latter. *Elonis*, 135 S. Ct. at 2011–12. We hew to the three pillars of the Supreme Court's reasoning and reach the same conclusion.

First, the Court reaffirmed that "'mere omission from a criminal enactment of any mention of criminal intent' should not be read as 'dispensing with it.'" 135 S. Ct. at 2009 (quoting *Morissette v. United States*, 342 U.S. 246, 250 (1952)). The Court explained that "[t]his rule of construction reflects the basic principle that wrongdoing must be conscious to be criminal." *Id.* (internal quotation marks omitted) (also noting that "the general rule is that a guilty mind is a necessary

element in the indictment and proof of every crime" (internal quotation marks omitted)). Thus, we will read mens rea requirements into criminal statutes "even where the statute by its terms does not contain them." *Id.* By the same token, because our criminal justice system is premised on a "belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil," *id.* (quoting *Morissette*, 342 U.S. at 250),[15] we require a clear statement from the legislature before we will conclude that a defendant may be found guilty of a crime without regard to his subjective state of mind. *Id.* at 2011.

Second, as the Supreme Court explained, "[t]he presumption in favor of a scienter requirement . . . appl[ies] to *each* of the statutory elements that criminalize otherwise innocent conduct." *Elonis*, 135 S. Ct. at 2011 (internal quotation marks omitted) (quoting *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 72 (1994)); *see also Staples v. United States*, 511 U.S. 600, 609 (1994) ("[D]ifferent elements of the same offense can require different mental states."); *United States v. Bailey*, 444 U.S. 394, 405–06 (1980) ("Clear analysis requires that the question of the kind

---

[15] *See also Liparota v. United States*, 471 U.S. 419, 425 (1985); *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 436 (1978).

of culpability required to establish the commission of an offense be faced separately with respect to each material element of the crime." (brackets omitted)).

Third, in furtherance of the aim to distinguish "wrongful conduct from otherwise innocent conduct," *Elonis*, 135 S. Ct. at 2010 (internal quotation marks omitted), the Supreme Court indicated that careful attention should be paid to gradations of mens rea, which it discussed using the hierarchy of culpable mental states set forth in the Model Penal Code (MPC): purpose, knowledge, recklessness, and negligence.[16] The Court explained that, in some cases, "to protect the innocent actor," courts should infer that the government must prove that

---

[16] Model Penal Code § 2.02 (2)(a)–(d) (Am. Law Inst., Proposed Official Draft 1962) (defining these terms). Before *Elonis*, the Supreme Court endorsed the MPC taxonomy for mens rea in *Bailey*, 444 U.S. at 403–04, and *U.S. Gypsum Co.*, 438 U.S. at 443–44. *See also Voisine v. United States*, 136 S. Ct. 2272, 2278 (2016) (utilizing the MPC definitions of purpose, knowledge, and recklessness to interpret a federal statute). And the Court has repeatedly signaled that looser categorizations of "general" and "specific" intent, used by Justice Thomas in his dissent in *Elonis*, 135 S. Ct. at 2018–24, are inadequate. *See, e.g.*, *Liparota*, 471 U.S. at 423 n.5 ("[T]he mental element in criminal law encompasses more than the two possibilities of 'specific' and 'general' intent."); *id.* at 433 n.16 (suggesting that, on remand, the jury instruction utilize the MPC mental states "and eschew use of difficult legal concepts like 'specific intent' and 'general intent'"); *Bailey*, 444 U.S. at 403 ("At common law, crimes generally were classified as requiring either 'general intent' or 'specific intent.' This venerable distinction, however, has been the source of a good deal of confusion.").

the defendant purposely[17] engaged in the prohibited conduct. *Elonis*, 135 S. Ct. at 2010. But generally, courts should infer that the government must prove at least that a defendant "know[s][18] the facts that make his conduct fit the definition of the offense."[19] *Elonis*, 135 S. Ct. at 2009.[20] The Court explained that merely inferring

---

[17] Model Penal Code § 2.02 (2)(a) ("A person acts purposely with respect to a material element of an offense when: (i) if the element involves the nature of his conduct or a result thereof, it is his conscious object to engage in conduct of that nature or to cause such a result; and (ii) if the element involves the attendant circumstances, he is aware of the existence of such circumstances or he believes or hopes that they exist.").

[18] Model Penal Code § 2.02 (2)(b) ("A person acts knowingly with respect to a material element of an offense when: (i) if the element involves the nature of his conduct or the attendant circumstances, he is aware that his conduct is of that nature or that such circumstances exist; and (ii) if the element involves a result of his conduct, he is aware that it is practically certain that his conduct will cause such a result.").

[19] This is so "even if he does not know that those facts give rise to a crime." *Elonis*, 135 S. Ct. at 2009. Knowledge that one is violating a criminal statute is not required; ignorance of the law is not a defense. *Id.*

[20] For this proposition, the Court cited *Morissette*, 342 U.S. at 271 (requiring proof of knowledge that shell casings belonged to someone else to obtain conviction for conversion); *Liparota*, 471 U.S. at 425–27, 433 (requiring proof of knowledge of facts that made possession or use of food stamps unauthorized to obtain conviction for unauthorized possession or use of food stamps); *Posters 'N' Things, Ltd. v. United States*, 511 U.S. 513, 524 (1994) (requiring proof of knowledge that certain items were likely to be used with illegal drugs to obtain conviction for possession of drug paraphernalia); *Staples*, 511 U.S. at 605 (defining "a conventional *mens rea* element" as one "which would require that the defendant *know the facts* that make his conduct illegal" (second emphasis added)); *X-Citement Video*, 513 U.S. at 73 (requiring proof of knowledge of the age of performers in sexually explicit material to sustain conviction for receiving, distributing, or reproducing child pornography); and *Carter*, 530 U.S. at 268 (explaining that "the presumption in favor of scienter demands only that we read

(continued…)

a negligence, i.e., should-have-known, standard[21] is disfavored. *Id.* at 2011. In short, the Court made clear that, when determining culpability, "what [a defendant] thinks does matter."[22] *Id.* (internal quotation marks omitted).

---

(…continued)
[the statute in question] as requiring proof . . . that the defendant possessed knowledge with respect to the actus reus of the crime" (emphasis omitted)).

Other supporting authority abounds in the Court's precedent. *See, e.g.*, *Bailey*, 444 U.S. at 408 (explaining that the default mens rea for statutes that are silent or ambiguous is "generally . . . proof that the defendant acted knowingly," with the exception of public welfare offenses); *U.S. Gypsum Co.*, 438 U.S. at 445. In *U.S. Gypsum Co.*, the Court specifically noted that "[t]he element of intent in the criminal law has traditionally been viewed as a bifurcated concept embracing either the specific requirement of purpose or the more general one of knowledge or awareness." 438 U.S. at 445. "[A] person who acts (or omits to act) intends a result of his act (or omission) under two quite different circumstances: (1) when he consciously desires that result . . . and (2) when he knows that the result is practically certain to follow from his conduct . . . ." *Id.*

[21] Model Penal Code § 2.02 (2)(d) ("A person acts negligently with respect to a material element of an offense when he should be aware of a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that the actor's failure to perceive it, considering the nature and purpose of his conduct and the circumstances known to him, involves a gross deviation from the standard of care that a reasonable person would observe in the actor's situation.").

[22] The Court additionally observed that the judiciary's job is to "read into [a] statute only that mens rea which is necessary to separate wrongful conduct from otherwise innocent conduct." *Elonis*, 135 S. Ct. at 2010 (internal quotation marks omitted) (quoting *Carter*, 530 U.S. at 269). It is not entirely clear what the Court meant by this, but, read in the context of *Carter*, it appears the Court was distinguishing between "general intent" and "specific intent," *see Carter*, 530 U.S. at 267–69, which the Court had previously likened to "knowledge" and "purpose," respectively, *Bailey*, 444 U.S. at 405 ("In a general sense, 'purpose' corresponds loosely with the common-law concept of specific intent, while 'knowledge' corresponds loosely with the concept of general intent."). *Cf. Voisine*, 136 S. Ct. at

(continued…)

Applying these principles, the Supreme Court examined the actus reus of the federal crime of threats in its distinct parts—as it defined them, (1) the transmission of a communication, and (2) "the fact that that communication contains a threat"[23]—and determined the mens rea for each. *Elonis*, 135 S. Ct. at 2011.

As to the conduct element, the Court determined that there was no dispute: a defendant "must know that he is transmitting a communication." 135 S. Ct. at

---

(…continued)
2281 (explaining that "[r]ecklessness was not a word in the common law's standard lexicon, nor an idea in its conceptual framework"). Thus it does not appear that the Court was suggesting that a reviewing court must only read into the statute the minimum mens rea it deems plausible (and, as discussed below, the Supreme Court did not in fact do this in *Elonis*, *see infra* p. 17). Moreover, such an exercise of statutory interpretation would seem to be in tension with the rule of lenity, under which we adopt the less harsh interpretation of an otherwise ambiguous statute and leave it to the legislature to clarify statutory terms if it wishes harsher or broader application. *See Carrell*, 80 A.3d at 176–77 (Schwelb, J., dissenting) ("[T]he rule of lenity requires ambiguous criminal [statutes] to be interpreted in favor of the defendants subjected to them." (quoting *United States v. Santos*, 553 U.S. 507, 514 (2008))); *see also Ruffin*, 76 A.3d at 858 (discussing the District's felony threats statute and observing that "the rule of lenity requires that, when a choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite").

[23] These actus reus elements align with the conduct and result elements, respectively, in the District's threats statutes. *See supra* note 13 and accompanying text. The federal statute contains additional elements not at issue in *Elonis*. *See* 18 U.S.C. § 875 (c).

2011. Similarly, in Mr. Carrell's case, there has never been any question that the government must prove that Mr. Carrell "intended" to communicate the words alleged to be a threat, i.e., he knew he was transmitting a communication.[24] But the Supreme Court made clear that criminal liability for threats could not rest solely on this determination: "[C]ommunicating something is not what makes the conduct 'wrongful.' Here the crucial element separating legal innocence from wrongful conduct is the threatening nature of the communication. The mental state requirement must therefore apply to the fact that the communication contains a threat." *Id.* at 2011 (emphasis, citation, and internal quotation marks omitted).

As to the result element of the crime, the Court held that it was not enough to require the government to prove that a reasonable person would understand the communication to contain a threat, because that would amount to a negligence standard and contravene the "conventional requirement" in our criminal justice

---

[24] The government must also prove that the defendant's communication was voluntary, a requirement subsumed in the requirement to prove "that the [appellant] intended to utter the words which constituted the threat," *Kaliku v. United States*, 994 A.2d 765, 788 (D.C. 2010) (internal quotation marks omitted). *See Conley v. United States*, 79 A.3d 270, 279 (D.C. 2013) ("No one, of course, can be held criminally liable 'for failing to do an act that he is physically incapable of performing.'" (citing Model Penal Code § 2.01 (1) (Am. Law Inst., Proposed Official Draft 1962) ("A person is not guilty of an offense unless his liability is based on conduct that includes a voluntary act or the omission to perform an act of which he is physically capable.")).

system that the defendant be aware of his wrongdoing. *Elonis*, 135 S. Ct. at 2011. Instead, the mens rea requirement "is satisfied if the defendant transmit[ted] a communication for the purpose of issuing a threat, or with knowledge that the communication will be viewed as a threat." *Id.* at 2012.

Applying the principles of *Elonis*, we too hold that, in interpreting our threats statute, and in particular the result element of the crime as we have defined it, *see supra* note 13 and accompanying text, more is required than a showing that a reasonable person would have understood the defendant's words as a threat or that a defendant should have known that that would be the case.[25]

Following the lead of the Supreme Court, *see supra* note 16, we likewise conclude that more precise gradations of mens rea should be employed. We have previously expressed concern about the use of "general" and "specific" intent.[26] We reiterate our endorsement of more particularized and standardized

---

[25] The government has conceded this much.

[26] *See Jones* (*Richard*), 124 A.3d at 130 n.3 (citing *Perry v. United States*, 36 A.3d 799, 809 n.18 (D.C. 2011)) ("Ideally, instead of describing a crime as a 'general intent' or 'specific intent' crime, courts and legislatures would simply make clear what mental state (for example, strict liability, negligence, recklessness, knowledge, or purpose) is required for whatever material element is at issue (for example, conduct, resulting harm, or an attendant circumstance . . .).").

categorizations of mens rea, and, in the absence of a statutory scheme setting forth such categorizations,[27] we, like the Supreme Court, look to the Model Penal Code terms and their definitions. *See supra* notes 17, 18, and 21.

Applying this hierarchy of mens rea levels to the actus reus result element of the crime of threats, we hold that the government may carry its burden of proof by establishing that the defendant acted with the purpose to threaten or with knowledge that his words would be perceived as a threat. *Elonis*, 135 S. Ct. at 2012. Like the Supreme Court, however, we decline to decide whether a lesser threshold mens rea for the second element of the crime of threats—recklessness— would suffice.

---

[27] A number of states have statutorily adopted the MPC hierarchy of mens rea terms. *See* Ala. Code § 13A-2-2 (2017); Alaska Stat. § 11.81.900 (2016); Ariz. Rev. Stat. Ann. § 13-105 (10) (2017); Ark. Code Ann. § 5-2-202 (2016); Colo. Rev. Stat. § 18-1-501 (2016); Conn. Gen. Stat. § 53a-3 (11)–(14) (2016); Del. Code Ann. tit. 11, § 231 (2017); Haw. Rev. Stat. Ann. § 702-206 (LexisNexis 2017); 720 Ill. Comp. Stat. 5/4-3–5/4-7 (West 2016); Ind. Code Ann. § 35-41-2-2 (West 2016); Kan. Stat. Ann. § 21-5202 (West 2017) (codifying purpose, knowledge, and recklessness, but not negligence); Me. Stat. tit. 17-A, § 35 (2017); Mo. Ann. Stat. § 562.016 (West 2016); N.H. Rev. Stat. Ann. § 626:2 (2017); N.Y. Penal Law § 15.05 (McKinney 2017); N.D. Cent. Code § 12.1-02-02 (2017); Ohio Rev. Code Ann. § 2901.22 (LexisNexis 2017); Or. Rev. Stat. Ann. § 161.085 (West 2017); 18 Pa. Stat. and Cons. Stat. Ann. § 302 (West 2016); S.D. Codified Laws § 22-1-2 (2017); Tenn. Code Ann. § 39-11-302 (2016); Tex. Penal Code Ann. § 6.03 (West 2015); Utah Code Ann. § 76-2-103 (LexisNexis 2016); Wash. Rev. Code Ann. § 9A.08.010 (West 2016).

We defer resolution of this issue for multiple reasons, among them: (1) post-*Elonis*, the majority of federal courts confronting this question have taken their cue from the Supreme Court and have declined to reach it;[28] (2) given that we

---

[28] Since *Elonis*, four federal appellate courts appear to have endorsed knowledge as the minimum acceptable mens rea for the federal threats statute through omission of any reference to recklessness. *See United States v. Dutcher*, 851 F.3d 757, 761 (7th Cir. 2017) (interpreting *Elonis* to require "that the speaker must know that his communication contains a threat" to be found guilty under 18 U.S.C. § 875 (c)); *United States v. LaFontaine*, 847 F.3d 974, 979–80 (8th Cir. 2017) (citing *Elonis* for the proposition that "the government had to prove that [the defendant] . . . at least knew that the communication would be viewed as threatening"); *United States v. Davis*, No. 15-10402, 2017 WL 1364283, at *2 (9th Cir. Apr. 14, 2017) (interpreting *Elonis* to conclude that, "with respect to the federal threats statute, a defendant must know that the transmitted communication contains a threat"); *United States v. Jordan*, No. 14-1377, 2017 WL 491144, at *11 n.13 (10th Cir. Feb. 7, 2017) (noting that "[t]he Supreme Court recently addressed whether 18 U.S.C. § 875 (c) . . . requires a mens rea" and describing the holding as "*requir[ing]* that 'the defendant transmit [] a communication for the purpose of issuing a threat, or with knowledge that the communication will be viewed as a threat'" (emphasis added) (quoting *Elonis*, 135 S. Ct. at 2012)).

The remaining federal appellate courts that have decided threats cases post-*Elonis* have followed in the Supreme Court's footsteps and have avoided deciding whether recklessness is sufficient. *See United States v. Choudhry*, 649 F. App'x 60, 62–63 (2d Cir. 2016) (affirming conviction where evidence was sufficient to convict the appellant under a purpose or knowledge standard, either of which "satisfie[s]" the "mental state requirement"); *United States v. Elonis*, 841 F.3d 589, 597 (3d Cir. 2016) (noting, on remand from the Supreme Court, that the Court declined to address recklessness); *United States v. White*, 810 F.3d 212, 220–21 (4th Cir. 2016) (acknowledging that whether recklessness is sufficient to satisfy the mens rea requirement is unresolved); *United States v. Houston*, 792 F.3d 663, 669 (6th Cir. 2015) ("tak[ing] the same route" as the Supreme Court and declining to address the issue of recklessness); *United States v. Martinez*, 800 F.3d 1293, 1294 (11th Cir. 2015) (dismissing an indictment for failure to allege an essential element, namely that the defendant "subjectively intended to convey a threat to

(continued…)

adhere to the reasoning of *Elonis*, and that the same legislature (Congress) enacted the federal threats statute and our threats statutes, we hesitate at this juncture to adopt a mens rea for our threats crimes that may turn out to conflict with what the Supreme Court or the majority of federal courts ultimately adopt; (3) we prefer to make a more informed judgment on the question whether recklessness suffices in the context of a factual situation that concretely presents the issue; and (4) we have no need to reach the question in this case, because, while the parties before us disagree in the abstract, the prosecuting agency, the United States Attorney's Office, disclaims reliance on recklessness, discounts the need to resolve the question as a general matter, and states that it does not intend to prosecute future threats cases on a recklessness theory.[29]

Thus, we leave for another day whether a defendant can be found guilty of the crime of threats based on a showing that he recklessly uttered words as a threat.

---

(…continued)
injure others"); *United States v. Sherbow*, No. 14-3088, 2016 WL 1272907, at \*1 (D.C. Cir. Feb. 12, 2016) (per curiam) (reversing conviction and remanding for further proceedings "consistent with" *Elonis*, without stating the applicable standard).

[29] The Public Defender Service (PDS), as amicus, notes that the District also prosecutes threats crimes. The District, however, did not join the United States' brief or file an amicus brief in this case to state a distinct position on the issues presented.

For now, we decide only that, to obtain a conviction for threats, the government may carry its burden of proof by establishing that the defendant acted with the purpose to threaten or with knowledge that his words would be perceived as a threat.

### III.    Standard of Review and Appropriate Remedy

We turn now to the appropriate disposition of Mr. Carrell's case. Echoing the analysis of the division, the government argues that, even if we hold that the mens rea for the result element of threats is satisfied by proof of purpose or knowledge, as we have done, Mr. Carrell is entitled to no relief, because he did not preserve a challenge to the trial court's verdict on this basis, and he cannot satisfy the test for plain error. We conclude that, at his bench trial, Mr. Carrell adequately preserved his challenge to the sufficiency of the evidence—which encompassed his mens rea claim—and the test for plain error has no application to this case.[30]

---

[30] We note that the government did not contend that Mr. Carrell's mens rea argument was unpreserved and subject to plain error in its briefing to the division. Rather, after addressing his sufficiency claim, the government argued that, "to the extent that" Mr. Carrell was making a separate argument that "the trial court erred in failing to make ... explicit finding[s]" under Rule 23 (c), his claim was unpreserved. We thus could conclude that the government waived its preservation challenge as to Mr. Carrell's sufficiency claim, *see Wilson-Bey v. United States*, 903 A.2d 818, 827 (D.C. 2006) (en banc) (acknowledging the government can

(continued…)

In his initial brief to a division of this court, Mr. Carrell argued that the evidence was insufficient to sustain his conviction, because the trial court—the factfinder—was obligated to find that he had uttered the alleged threatening words as a threat; the trial court did not so find; and the evidence did not support such a finding. The division rejected his claim on the merits, and then added that, because Mr. Carrell had made no request for special findings of fact under Super. Ct. Crim. R. 23 (c), "his claim of error here is subject to plain error review at best." *Carrell*, 80 A.3d at 171. But Mr. Carrell's appellate claim before the division did not pertain to the accuracy or validity of the trial court's factual findings; indeed, he never cited Rule 23 and he expressly stated that the factual findings the trial court made were not in dispute. Instead, his claim was that the evidence was insufficient to sustain his conviction because he did not have the requisite mens rea to threaten the complainant—a claim which was predicated on his argument that a showing of such mens rea was required. *See Carrell*, 80 A.3d at 177 n.7 (Schwelb, J., dissenting) (observing Mr. Carrell's "basic contention [wa]s that the judge applied the wrong legal standard" in assessing Mr. Carrell's guilt).

---

(…continued)
waive the application of plain error review, i.e., "waive the waiver"), but in order to clarify our law regarding preservation, we opt to address the preservation issue directly.

As we explained in *Newby v. United States*, 797 A.2d 1233 (D.C. 2002), it is well settled in this jurisdiction that a "full range of challenges" to the sufficiency of the evidence are automatically preserved at a bench trial by a defendant's plea of not guilty. *Id.* at 1237–38 & n.2 (observing that, "in a non-jury proceeding . . . sufficiency challenges may be preserved whether or not the defense raises them at trial"). Moreover, such sufficiency challenges encompass challenges to the requisite elements of the crime. *See, e.g.*, *Sutton v. United States*, 988 A.2d 478, 482 (D.C. 2010) ("This court . . . reviews de novo the elements of the crime which the prosecution must prove and against which sufficiency of the evidence is assessed."). Thus, in *Newby*, as here, the defendant argued on appeal that the trial court failed to find that she acted with the mens rea necessary to sustain a conviction (malice) and that the record evidence was insufficient to support such a determination; she had not made this claim in the trial court. 797 A.2d at 1237. Nevertheless, we concluded that her argument was preserved for our review, because it was "in reality a challenge to the sufficiency of the evidence to sustain her conviction." *Id.* At his bench trial, Mr. Carrell not only pled not guilty but also made a general motion for a judgment of acquittal challenging the sufficiency of the government's evidence. Thus, Mr. Carrell's claim that the trial court was obligated to find that he acted with purpose or knowledge is preserved as part of

his repeated challenge to the sufficiency of the evidence to sustain his conviction for attempted threats.

We turn then to the sufficiency question. As explained above, under our law of threats, Mr. Carrell could not have been found guilty based on a showing of mere negligence, but he could have been found guilty if the government proved that he had the purpose to threaten the complainant or that he knew his words would be perceived as a threat. Thus, we consider whether, "[v]iewing the evidence in the light most favorable to the government," *Ortberg v. United States*, 81 A.3d 303, 309 (D.C. 2013), a reasonable factfinder could have determined that the government proved Mr. Carrell's purpose or knowledge beyond a reasonable doubt. *See Rivas v. United States*, 783 A.2d 125, 133–34 (D.C. 2001) (en banc). Mr. Carrell's briefing is silent on this point; he directs us to no record evidence that would have precluded such a finding. We conclude that a reasonable factfinder could have determined that he acted with a mens rea adequate to support his conviction of attempted threats.

But our analysis does not end here. The fact remains that the trial court did not apply the law as we have outlined it above.[31] Specifically, the court only assessed Mr. Carrell's mens rea as to the conduct element for attempted threats and determined that Mr. Carrell had "intended to utter the words which constituted the threat." The trial court did not determine that Mr. Carrell spoke these words to the complainant with knowledge or purpose that they would be understood as a threat.

Mr. Carrell requests that, to remedy the trial court's legal error, we remand the case to the trial court to apply the law of threats as we have outlined in this opinion and issue a verdict thereunder. The government counters that no remand is necessary. Citing *Neder v. United States*, 527 U.S. 1, 4 (1999), and *Wilson-Bey v. United States*, 903 A.2d 818, 843 (D.C. 2006) (en banc), the government argues (in the alternative to its plain error argument) that we must assess whether the trial court's error was harmless under the *Chapman* standard,[32] just as we would when a jury has been misinstructed as to the elements of a crime.[33] The government

---

[31] We do not fault the trial court. As explained above, this court developed two conflicting lines of authority regarding the elements of threats. *See supra* p. 2.

[32] *Chapman v. California*, 386 U.S. 18, 24 (1967) (setting forth the harmless error analysis for constitutional errors).

[33] In either case, the defendant's constitutional rights are compromised. When a trial court decides guilt under an incorrect legal framework, any reduction of the government's burden of proof compromises the defendant's right under the

(continued…)

further argues that the trial court's failure to consider whether Mr. Carrell acted with knowledge or purpose was harmless. We agree that we must assess whether the trial court's error was harmless under *Chapman*. D.C. Code § 11-721 (e) (2012 Repl.) ("On the hearing of any appeal in any case, the District of Columbia Court of Appeals shall give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties."); *see also United States v. Argueta-Rosales*, 819 F.3d 1149, 1156 (9th Cir. 2016) ("When a district court in a bench trial has made a legal error regarding the elements of an offense, the error is reviewed using the same harmless error standard that would apply to an erroneous jury instruction," i.e., the *Chapman* standard.);[34] *United States v. Sheehan*, 512 F.3d 621, 631 (D.C. Cir. 2008) (determining that the trial court made the legal error of "eliminat[ing] the prosecutor's burden of proving *mens rea*," and applying the *Chapman* standard for harmless error); *Douglas v. United States*, 859 A.2d 641, 642 (D.C. 2004)

---

(…continued)

Due Process Clauses of the Fifth and Fourteenth Amendments to have the government prove all the elements of the offense beyond a reasonable doubt. *See In re Winship*, 397 U.S. 358, 364 (1970). When the jury is misinstructed "on an element of the offense," the defendant's "Sixth Amendment[] jury trial guarantee" is violated. *Neder*, 527 U.S. at 12.

[34] We apply the same harmless error standards as the federal courts. *Compare* D.C. Code § 11-721 (e), *with* 28 U.S.C.A. § 2111 (West 2017); *see also Randolph v. United States*, 882 A.2d 210, 222 & n.17 (D.C. 2005).

(effectively applying *Chapman* harmless error where the trial court "arguably" erred in determining that the defendant had failed to make out a prima facie case of self-defense but then made the same credibility findings it would have made had the court properly placed the burden to disprove self-defense on the government). But we disagree that the error in this case was harmless.

Under *Chapman*, an error is considered harmless if the government can "show beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993); *see also Wilson-Bey*, 903 A.2d at 844 (en banc). "[T]he question . . . is not what effect the constitutional error might generally be expected to have upon a reasonable [factfinder], but rather *what effect it had upon the guilty verdict in the case at hand*." *Sullivan*, 508 U.S. at 279 (emphasis added). It is thus beside the point that we have already concluded that the evidence was legally sufficient;[35] the pertinent question is whether we can say, beyond a reasonable doubt, that the trial court

---

[35] Quantifying the effect on the verdict is distinct from an assessment that the evidence was legally sufficient. *In re Ty.B.*, 878 A.2d 1255, 1266–67 (D.C. 2005) ("[T]he sufficiency issue is distinct from that of harmless error."); *see also Bell v. United States*, 801 A.2d 117, 129 (D.C. 2002) ("Mere sufficiency of the evidence . . . does not dictate a finding of harmless error."); *Fox v. United States*, 421 A.2d 9, 14 (D.C. 1980) (finding the evidence "sufficient to permit a guilty verdict . . . [but] not, however, . . . so strong as to justify a conclusion that the erro[r] . . . was harmless").

would have issued a guilty verdict in this case based on a determination that Mr. Carrell acted with purpose or knowledge when he threatened the complainant. On this record, we cannot.

As a benchmark, we look to *Douglas*, 859 A.2d 641, the only published case we are aware of where we have upheld a conviction notwithstanding a trial court's "arguabl[e]" error in defining the government's burden of proof. *Id.* at 642. We explained in *Douglas* that the trial court's failure to require the government to disprove the defendant's claim of self-defense was "entirely academic," because the trial court did not credit the only evidence proffered in support of that claim. *Id.* Thus, even if the trial judge had "'instructed herself' correctly on the law of self-defense . . . her determination as fact-finder that [defendant's] account was not credible would have led her to the same conclusion—that [defendant] did not act in self-defense. [Defendant] therefore suffered no prejudice from the judge's putative legal error . . . ." *Id.* Put another way, we were able to conclude that the trial court's error in *Douglas*, if any, was harmless beyond a reasonable doubt, because the trial court made the same finding in support of guilt it would have made had it correctly applied the law.

In contrast to *Douglas*, we concluded in *Williams* (*Shirley*) *v. United States*, 90 A.3d 1124 (D.C. 2014), and *Ewell v. United States*, 72 A.3d 127 (D.C. 2013), that the trial court's legal error in identifying what the government had to prove was not harmless, because the trial court did not make the findings it would have made if it had applied the correct legal standard in the first instance. *See Williams* (*Shirley*), 90 A.3d at 1128–29 ("*Douglas* is the antithesis of the case before us now. Here, the judge did not make any credibility determinations or factual findings . . . . We cannot thus dispose of the issue in the way we did in *Douglas* by deferring to a specific factual finding [of the trial court]."); *Ewell*, 72 A.3d at 131–32 (After concluding that "the trial court applied the incorrect legal standard," the court held that the trial court failed to make the factual findings necessary for the appellate court "to apply the proper standard . . . to this record" and to find the error harmless.). And we explained in *Williams* (*Shirley*) that "[i]n [such] a situation[,] where the trial court did not make the findings of fact necessary to support an adjudication[,] our usual course [is] to return the case to the trial court to make adequate findings of fact."[36] 90 A.3d at 1129; *see also Ewell*, 72 A.3d at

---

[36] We did not follow this "usual practice" in *Williams* (*Shirley*), however, because we determined that the evidence in the case was legally insufficient to support a finding of guilt. 90 A.3d at 1129. We have also declined to remand and have instead reversed a conviction outright in cases where a trial court erred in identifying what the government must prove but then incidentally made findings of fact that precluded guilt as a matter of law. *See Cave v. United States*, 75 A.3d

(continued…)

131–32 (same). Reflecting this practice, we have a number of published decisions in which, albeit without an express discussion of harmless error, we have remanded the case after determining that the trial court applied an incorrect legal standard *and* failed to make the necessary factual findings required under the correct standard.[37] The bottom line is that "[a]s an appellate court, we do not make findings of fact and therefore may not rule on our own reading of the evidence

_____

(…continued)
145, 147 (D.C. 2013); *cf. Clark* (*Rayshawn*) *v. United States*, 147 A.3d 318, 328 n.14 (D.C. 2016) (explaining that, upon reviewing bench trials, "we can review the sufficiency of th[e trial court's] *findings*" and "reverse outright if the trial court made a factual finding that cannot satisfy an element of the crime").

[37] *See, e.g.*, *Warner v. United States*, 124 A.3d 79, 88–89 (D.C. 2015) (remanding the case to the trial court because "even if the evidence may be sufficient to sustain appellant's conviction, it does not compel it" (brackets and internal quotation marks omitted)); *Buchanan v. United States*, 32 A.3d 990, 991 (D.C. 2011) (per curiam) (remanding the case for the trial court to "clarify the [mens rea that the court had] found exhibited by appellant's actions" and to reassess the defendant's guilt in light of that clarification); *Jones* (*Andre*) *v. United States*, 16 A.3d 966, 971–72 (D.C. 2011) (remanding the case in light of "the absence of an explicit credibility determination and specific factual findings . . . regarding the basis of [the trial court's] guilty verdict"); *Howard v. United States*, 966 A.2d 854, 857 (D.C. 2009) (remanding the case where "the trial court did not make any credibility determinations or factual findings to resolve" conflicting testimony, because, unlike "a jury trial ending with a general verdict, [in which] we would have been able to affirm based on the evidence," in a bench trial "we must remand so that the trial court may determine whether to convict based on a more comprehensive view of the evidence"); *Williams* (*Antwan*), 887 A.2d at 1000–01 (remanding the case, even though the evidence was sufficient to sustain a conviction, because the court was "unable to determine what the judge's findings would have been if she had decided the case on the basis of correct legal principles").

unaided by the trial court's findings. . . ." *Lihlakha v. United States*, 89 A.3d 479, 490 (D.C. 2014).[38]

In Mr. Carrell's case, the trial court did not incidentally make a finding, necessary under the correct legal standard as we have articulated it here, that Mr. Carrell had the purpose or knowledge that his words would be received as a threat. To the extent it alluded to his mens rea at all, the court noted that "that Mr. Carrell reacted under these circumstances understandably frustrated" and that Mr. Carrell

---

[38] Our application of *Chapman* harmless error analysis plays out differently when reviewing a jury verdict, because in that context, we do not know how the jury viewed the evidence, *see United States v. Benally*, 546 F.3d 1230, 1233 (10th Cir. 2008) (observing that "[j]ury decision-making is designed to be a black box . . . [in which] the inner workings and deliberation of the jury are deliberately insulated from subsequent review"), *abrogated by Pena-Rodriguez v. Colorado*, 137 S. Ct. 855 (2017) (recognizing "a [limited] constitutional exception to the no-impeachment rule for instances of racial bias" in jury deliberations), and we cannot return the case to the jury. Thus in jury trial cases, we affirm the conviction if we think "that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error." *Neder*, 527 U.S. at 17. By contrast, in a bench trial, we often *know* the inferences the factfinder made and declined to make, *see Clark (Rayshawn)*, 147 A.3d at 328 n.14 (explaining that bench trial "findings on the record" are subject to appellate review because, unlike "secre[t] . . . jury deliberations," we know when "the trial court left a dispositive factual dispute unresolved" or resolved a specific issue in a manner inconsistent with the ultimate verdict), and remand is an accepted course of action. *See supra* note 37; *cf. Gay v. United States*, 12 A.3d 643, 647 (D.C. 2011) ("Where a trial court's 'findings of fact, conclusions of law and judgment, taken together,' do not 'present an integrated, internally consistent and readily understood whole,' remand is appropriate."); *accord Williams (Shirley)*, 90 A.3d at 1128 (citing *Gay*, 12 A.3d at 647); *Ewell*, 72 A.3d at 132 (same).

had "utter[ed] words to [the complainant] in his anger."  Although the evidence is sufficient to sustain a finding of purpose or knowledge, the trial court did not—and, when confronted with this mens rea question, perhaps will not—make such a determination.  Accordingly, we remand the case to allow the trial court to make the necessary mens rea finding, based on the law as set forth in this opinion, to determine if Mr. Carrell is guilty of the crime of attempted threats.

*So ordered.*

THOMPSON, *Associate Judge*, concurring in part and dissenting in part: I agree with my colleagues' conclusion that proof of the mens rea element of misdemeanor threats to do bodily harm under D.C. Code § 22-407 (2016 Supp.), or of felony threatening to injure the person of another under D.C. Code § 22-1810 (2016 Supp.),[1] requires more than evidence that the defendant intended to utter the words that constitute the threat. I also agree that proof that "the defendant acted with the purpose to threaten or with knowledge that his words would be perceived as a threat[,]" *ante*, at 3, 18, 21, will satisfy the mens rea required for conviction. However, I believe the opinion does not go far enough. I believe our court should conclude in addition that the mens rea element is satisfied if the defendant acted recklessly, i.e., uttered the words with conscious disregard of the substantial and unjustifiable risk that they would be perceived as a threat. I write separately to explain why I believe we should hold that recklessness is enough to satisfy the mens rea element (at least of § 22-407, if not § 22-1810).[2]

[1] Other than language added to the penalty clause of each of the threats statutes in 2013, see *infra* n.11, the language of each is the same as it was in January 2012, when Mr. Carrell's charged offenses occurred.

[2] I acknowledge this court's statement in *In re S.W.*, that "[t]he basic elements [of] felony and misdemeanor threats are the same." 45 A.3d 151, 155 n.9 (D.C. 2012) ("We have interpreted the elements of this misdemeanor [D.C. Code § 22-507 (1973), recodified as D.C. Code § 22–407 (2001),] to be the same as those of its subsequently enacted felony counterpart, D.C. Code § 22–2307 (1973) [recodified as D.C. Code § 22–1810 (2001)]." (alterations in original) (quoting (continued…)

"A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct." *Dorsey v. United States*, 902 A.2d 107, 113 (D.C. 2006) (internal quotation marks omitted) (quoting *Jones v. United States*, 813 A.2d 220, 225 (D.C. 2002) (quoting Model Penal Code § 2.02 (2)(c) (Am. Law Inst. 1985))). "Recklessly means that the defendant was aware of and disregarded the grave risk . . . created by his conduct." *Jones*, 813 A.2d at 225. The Supreme Court has observed that "subjective recklessness as used in the criminal law is a familiar and workable standard[.]" *Farmer v. Brennan*, 511 U.S. 825, 839 (1994); *see also id.* at 837 (Recklessness exists "when a person disregards a risk of harm of which he is aware." (citations omitted)).

---

(…continued)
*United States v. Baish*, 460 A.2d 38, 41 (D.C. 1983)) (citing *United States v. Young*, 376 A.2d 809 (D.C. 1977))). However, it is our felony threats statute (§ 22-1810), and not our misdemeanor threats statute, that was patterned after the federal threats statute (18 U.S.C. § 875 (c)). *See Holt v. United States*, 565 A.2d 970, 973–74 (D.C. 1989) (en banc). If we are concerned that the more severe penalties that follow a felony conviction should not be imposed for recklessly uttering a threat and likewise are reluctant to interpret § 22-1810 in a manner inconsistent with how the federal circuit courts of appeal may eventually interpret its federal counterpart, these may be reasons to reconsider our ruling that all of the elements of the misdemeanor and felony threats offenses — the mens rea element as well as the actus reus — are the same.

There are several reasons why I believe we should hold that recklessness is enough to satisfy the mens rea element of our threats statutes:

1. <u>Reckless conduct is culpable, not innocent</u>. The first reason follows from the Supreme Court's explanation that when a court is interpreting a criminal statute that is "silent on the required mental state," it is appropriate to "read into the statute only that *mens rea* which is necessary to separate wrongful conduct from otherwise innocent conduct." *Elonis v. United States*, 135 S. Ct. 2001, 2010 (2015) (alteration in original) (internal quotation marks omitted). In his opinion concurring in part and dissenting in part in *Elonis*, Justice Alito explained eloquently why recklessness must be taken into account to separate wrongful from innocent conduct. He wrote:

> There can be no real dispute that recklessness regarding a risk of serious harm is wrongful conduct. . . . Someone who acts recklessly with respect to conveying a threat necessarily grasps that he is not engaged in innocent conduct. He is not merely careless. He is aware that others could regard his statements as a threat, but he delivers them anyway.
>
> Accordingly, I would hold that a defendant may be convicted under [the statute] if he or she consciously disregards the risk that the communication transmitted will be interpreted as a true threat.

*Id.* at 2015–16 (Alito, J., concurring in part and dissenting in part) (noting that "[n]othing in the Court's non-committal opinion prevents lower courts from adopting [a recklessness] standard"); *see also id.* at 2014 ("[I]f recklessness is enough, and the jury is told [or the court instructs itself] that conviction requires proof of more, a guilty defendant may go free.").

I can add little to Justice Alito's succinct point, but I posit the following: consider (a) a person who utters words that he knows will be viewed as a threat by the ordinary hearer, but who also thinks, rightly or wrongly, that the target of his words will not view the words as threatening (a person who, on these facts, can be proven guilty of threats under the opinion of the en banc court); and (b) a person who, acting in conscious disregard of the substantial risk that his communication will be viewed as a threat by the ordinary hearer, utters the words anyway, simply not caring whether anyone will take the words as a serious threat. Is person (b) any less culpable than person (a)? It is clear to me that he is not (indeed, in my view, he is more culpable than person (a));[3] that a holding that recklessness is enough to

---

[3] *Cf. Tison v. Arizona*, 481 U.S. 137, 157 (1987) ("[S]ome nonintentional murderers may be among the most dangerous and inhumane of all[]—[]the person who tortures another not caring whether the victim lives or dies, or the robber who shoots someone in the course of the robbery, utterly indifferent to the fact that the desire to rob may have the unintended consequence of killing the victim as well as

(continued…)

satisfy the mens rea element of threats is necessary to separate person (b)'s conduct from innocent conduct; and that we therefore should construe our threats statutes to cover such wrongful conduct. Our laws prohibiting threats "'protect[] individuals from the fear of violence' and 'from the disruption that fear engenders,'" *Virginia v. Black*, 538 U.S. 343, 360 (2003) (quoting *R.A.V. v. City of St. Paul*, 505 U.S. 377, 388 (1992)), and the fear that a threat may cause can be just as terrifying, crippling, and onerous when the threat is communicated recklessly as it is when the threat is communicated with the specific intent to threaten.

As Justice Alito recognized, "[i]n a wide variety of contexts, [the Supreme Court] ha[s] described reckless conduct as morally culpable." *Elonis*, 135 S. Ct. at 2015 (Alito, J., concurring in part and dissenting in part); *see, e.g.*, *Smith v. Wade*, 461 U.S. 30, 43 n.10 (1983) ("[R]ecklessness is equivalent to intent, meaning that the two are equally culpable and deserving of punishment and deterrence." (internal quotation marks omitted)); *see also In re Cleaver-Bascombe*, 892 A.2d 396, 414 (D.C. 2006) (Glickman, J., concurring in part and dissenting in part) ("Recklessness is a culpable mental state tantamount to actual knowledge and intent.").

---

(…continued)
taking the victim's property. This reckless indifference to the value of human life may be every bit as shocking to the moral sense as an 'intent to kill.'").

2. <u>Recklessness suffices to establish criminal liability</u>. As the Supreme Court recognized in *Voisine v. United States*, 136 S. Ct. 2272 (2016), the Model Penal Code has "taken the position that a mens rea of recklessness should generally suffice to establish criminal liability[.]" *Id.* at 2280 (noting that "a significant majority of jurisdictions—34 [s]tates plus the District of Columbia—define[] [assault or battery] misdemeanor offenses to include the reckless infliction of bodily harm"). The courts in our jurisdiction have long signaled agreement with that general principle. In *Harris v. United States*, 8 App. D.C. 20 (1896), for example, the court rejected voluntary intoxication as a defense to a homicide charge, declining to "condon[e] . . . crime resulting from reckless habit" and observing that the offense was "committed under circumstances of . . . malignant recklessness."[4] *Id.* at 30, 31. In *Peyton v. District of Columbia*, 100 A.2d 36 (D.C. 1953), the court explained that an "exposure becomes indecent when the defendant

---

[4] Thus, the concept of recklessness as a basis for criminal liability had entered into the common law as it developed in our jurisdiction years before our misdemeanor threats statute was enacted in 1912. *See* Act of July 16, 1912, Pub. L. No. 62-226, ch. 235, § 2, 37 Stat. 192, 193.

"The crime of oral threats to do bodily harm was unknown to the common law[.]" *Postell v. United States*, 282 A.2d 551, 553 (D.C. 1971); *see also, e.g.*, *State v. Benedict*, 11 Vt. 236, 237 (1839) ("Whatever was once thought upon the subject, it is now well settled, that mere threats, in words not written, is not an indictable offence at common law."). (However, a statute enacted in 1901, now codified as D.C. Code § 22-404 (2016 Supp.), established a penalty for "[w]hoever . . . threatens another in a menacing manner[.]" Act of Mar. 3, 1901, ch. 854, § 806, 31 Stat. 1189, 1322.)

exposes himself at such a time and place . . . that it must be presumed that ["his exposed condition"] was intended to be seen by others" and held that the requisite criminal intent for indecent exposure can "be inferred from the recklessness of defendant's conduct in exposing himself." *Id.* at 37 (footnotes omitted).

3. Our legislature, like those in several other jurisdictions, has signaled that recklessness is a sufficient mens rea. The brief of the United States informs us that several states have established recklessness as their default mens rea where a statute is silent.[5] Our legislature has not enacted such a default mens rea statute but has specifically provided in a number of statutes that the requisite mens rea may be

---

[5] *See, e.g.*, Kan. Stat. Ann. § 21-5202 (e) (2011 Supp.) ("If the definition of a crime does not prescribe a culpable mental state, but one is nevertheless required . . . , 'intent,' 'knowledge' or 'recklessness' suffices to establish criminal responsibility."); 18 Pa. Cons. Stat. § 302 (c) (LEXIS through 2017 Regular Sess. Acts 1–6, 8–9) ("When the culpability sufficient to establish a material element of an offense is not prescribed by law, such element is established if a person acts intentionally, knowingly or recklessly with respect thereto."); Utah Code Ann. § 76-2-102 (LexisNexis 2012) ("[W]hen the definition of the offense does not specify a culpable mental state and the offense does not involve strict liability, intent, knowledge, or recklessness shall suffice to establish criminal responsibility."); Tenn. Code Ann. § 39-11-301 (c) (2014) ("If the definition of an offense within this title does not plainly dispense with a mental element, intent, knowledge or recklessness suffices to establish the culpable mental state."); Tex. Penal Code Ann. § 6.02 (c) (West, Westlaw through 2017 Chapter 49) ("If the definition of an offense does not prescribe a culpable mental state, but one is nevertheless required . . ., intent, knowledge, or recklessness suffices to establish criminal responsibility.").

satisfied by recklessness.[6] Of particular note are the statutes in which the Council of the District of Columbia (the "Council") has incorporated a recklessness standard in the elements of crimes that — like the threats statutes at issue in this case — involve threats to inflict injury, or conduct that puts another person in fear of harm. *See* D.C. Code § 22-1314.02 (a) (2012 Repl.) (making it generally unlawful for a person "to willfully or *recklessly* interfere with access to or from a medical facility or to willfully or recklessly disrupt the normal functioning of such

---

[6] *See, e.g.*, D.C. Code § 22-404 (a)(2) (2012 Repl.) (prescribing penalties for "[w]hoever unlawfully assaults, or threatens another in a menacing manner, and intentionally, knowingly, or *recklessly* causes significant bodily injury to another" (emphasis added)); D.C. Code § 22-934 (2012 Repl.) (providing that "[a] person who knowingly, willfully or through a wanton, *reckless* or willful indifference fails to discharge a duty to provide care and services necessary to maintain the physical and mental health of a vulnerable adult, including but not limited to providing adequate food, clothing, medicine, shelter, supervision and medical services, that a reasonable person would deem essential for the well-being of the vulnerable adult is guilty of criminal negligence" (emphasis added)); D.C. Code § 22-1006.01 (a)(5) (2012 Repl.) (establishing penalties to punish "any person who knowingly or *recklessly* permits [animal fighting] . . . to be done on any premises under his or her ownership or control, or who aids or abets that act" (emphasis added)); D.C. Code § 22-1101 (b)(1) (2012 Repl.) ("A person commits the crime of cruelty to children in the second degree if that person intentionally, knowingly, or *recklessly* . . . [m]altreats a child or engages in conduct which causes a grave risk of bodily injury to a child" (emphasis added)); D.C. Code § 22-1833 (1) (2012 Repl.) (making it "unlawful for an individual or a business to recruit, entice, harbor, transport, provide, obtain, or maintain by any means a person, knowing, or *in reckless disregard* of the fact that . . . [c]oercion will be used or is being used to cause the person to provide labor or services or to engage in a commercial sex act" (emphasis added)); D.C. Code § 22-1834 (a) (2012 Repl.) (making it unlawful to recruit or maintain by any means a person "who will be caused as a result to engage in a commercial sex act knowing or *in reckless disregard* of the fact that the person has not attained the age of 18 years" (emphasis added)).

facility," such as by "[*t*]*hreatening to inflict injury* on the owners, agents, patients, employees, or property of the medical facility" (emphasis added)); D.C. Code § 22-1321 (a)(1) (2012 Repl.) (making it unlawful, "[i]n any place open to the general public, and in the communal areas of multi-unit housing, . . . for a person to . . . [i]ntentionally or *recklessly* act in such a manner as to *cause another person to be in reasonable fear that a person . . . is likely to be harmed* or taken" (emphasis added)); D.C. Code 22-2803 (a)(1) (2012 Repl.) (providing that a person "commits the offense of carjacking if, by any means, that person knowingly or *recklessly* by force or violence, whether against resistance or by sudden or stealthy seizure or snatching, or *by putting in fear*, . . . shall take from another person immediate actual possession of a person's motor vehicle" (emphasis added)); D.C. Code § 22-3312.02 (a)(4) (2012 Repl.) (making it unlawful to, *inter alia*, burn a cross or other religious symbol or to display a Nazi swastika or noose on any private premises "where it is probable that a reasonable person would perceive that the intent is . . . [t]o cause another person to fear for his or her personal safety, or where it is probable that reasonable persons will be put in fear for their personal safety by the defendant's actions, *with reckless disregard for that probability*" (emphasis added)); D.C. Code § 22-3312.03 (a)(3), (b)(4) (prohibiting any person over sixteen years of age, "while wearing any mask, hood, or device whereby any portion of the face is hidden, concealed, or covered as to conceal the identity of the

wearer" from, *inter alia*, holding any meeting or demonstration "[w]ith the intent to cause another person to fear for his or her personal safety, or, *where it is probable that reasonable persons will be put in fear for their personal safety* by the defendant's actions, *with reckless disregard for that probability*" (emphasis added)).[7]

In essence, through the foregoing statutes, the Council has already indicated that the public policy of the District of Columbia is that reckless conduct (including reckless expressive conduct) making it probable that other persons will be put in fear of injury is punishable under our criminal laws. Thus, construing our threats statutes to include recklessness as a sufficient mens rea "is justified by a well-established pattern in our criminal laws." *Elonis*, 135 S. Ct. at 2014–15 (Alito, J., concurring in part and dissenting in part).

---

[7] Amicus Domestic Violence Legal Empowerment and Appeals Project ("DVLEAP") informs us that a number of other jurisdictions have enacted threats statutes that specify a mens rea of recklessness or reckless disregard. *E.g.*, Ala. Code § 13A-10-15 (2000); Conn. Gen. Stat. § 53a-62 (2017); Ga. Code Ann. § 6-11-37 (2016 Supp.); Haw. Rev. Stat. § 707-715 (2012 Repl.); Minn. Stat. § 609.713 (1) (2015 Supp.); Mo. Rev. Stat. § 574.120 (2017); N.J. Stat. Ann. § 2C.12-3 (2002); 18 Pa. Cons. Stat. § 2706 (LEXIS through 2017 Regular Sess. Acts 1–6, 8–9); Wyo. Stat. Ann. § 6-2-505 (1982).

4. <u>The history of our threats statutes and this court's interpretation of them also provide some reason for not requiring a higher mens rea than recklessness.</u> Mr. Carrell argues that an interpretation that the required mens rea is purpose to threaten, or knowledge that an utterance will be perceived as a threat, "more closely corresponds" to our case law (by which he means *United States v. Baish*, 460 A.2d 38 (D.C. 1983)). To the contrary, as the discussion below explains, construing the statutes to require only recklessness hews more closely to our case law that construed the statutes to have *no* intent requirement (and to the Council's apparent non-objection to that approach) and best avoids "stepping over the line"[8] that separates interpretation of our threats statutes from amendment of the statutes. Indeed, in light of the "putting in fear/threat to inflict injury" statutes cited above, in which the Council has provided that reckless disregard is enough for conviction, it seems likely that "to exclude [threats] committed with [a reckless] state of mind would substantially undermine"[9] the Council's legislative scheme.[10]

---

[8] *Elonis*, 135 S. Ct. at 2015 (Alito, J., concurring in part and dissenting in part).

[9] *Voisine*, 136 S. Ct. at 2278.

[10] This, it seems to me, is a sufficient response to my colleagues' rule of lenity point. *Ante*, at note 22. *See Moskal v. United States*, 498 U.S. 103, 108 (1990) (citing *United States v. Bass*, 404 U.S. 336, 347 (1971), for the principle that a "court should rely on lenity only if, after seizing every thing [sic] from which aid can be derived, it is left with an ambiguous statute"; observing that the

(continued…)

Both our misdemeanor threats statute and our felony threats statute originated as congressional enactments, § 22-407 in 1912 and § 22-1810 in 1968. *See ante*, at 7–8, note 8, note 9. However, the Council amended the penalty language of both in 2013, as part of a broad effort to provide generally for proportionality between fines and imprisonment penalties for criminal offenses.[11] When the Council did so, it was "deemed to know the . . . judicial gloss given to" the language of each statute and to have "adopt[ed] the existing interpretation unless it affirmatively act[ed] to change the meaning." *Pretka v. Kolter City Plaza II, Inc.*, 608 F.3d 744, 758–59 (11th Cir. 2010) (quoting *Bledsoe v. Palm Beach Cty. Soil & Water Conservation Dist.*, 133 F.3d 816, 822 (11th Cir. 1998)).[12] At

---

(…continued)
Court has "declined to deem a statute 'ambiguous' for purposes of lenity merely because it was *possible* to articulate a construction more narrow than that urged by the Government"; and noting that "a division of judicial authority [is not] automatically sufficient to trigger lenity" (alteration in original) (internal quotation marks and brackets omitted)).

[11] *See* Criminal Fine Proportionality Amendment Act of 2012, D.C. Law 19-317, § 203 (b), 60 D.C. Reg. 2064, 2073, 2086 (Feb. 22, 2013).

[12] *See also Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990) ("We assume that Congress is aware of existing law when it passes legislation." (citation omitted)); *Cannon v. Univ. of Chicago*, 441 U.S. 677, 696–98 (1979) ("It is always appropriate to assume that our elected representatives . . . know the law" and "that those representatives were aware of the prior interpretation of [the law] and that that interpretation reflects their intent with respect to [it]."); *United States v. Bailey*, 34 U.S. 238, 256 (1835) ("Congress must be presumed to have legislated under this known state of the laws . . . ." (quoted in *Voisine*, 136 S. Ct. at 2280));

(continued…)

the time, although divisions of this court had earlier articulated competing formulations of whether general intent to utter the words that constitute the threat (or, instead, specific intent to utter the words as a threat) was required for conviction under our threats statutes, the state of the law was this: we had "resolve[d] the conflict"[13] between the competing formulations in a 1989 en banc decision in which we said that "[t]he plain language of D.C.'s felony threats prohibition [and thus its misdemeanor threats prohibition, the elements of which are the same] does not include any intent element." *Holt*, 565 A.2d at 972. As Senior Judge Newman put it in the division decision in *Carrell*, *Holt* "vitiate[d] the contrary [1983] holding in *Baish*," *Carrell*, 80 A.3d at 170, i.e., that "the government must prove . . . that the defendant intended to utter these words as a threat," *Baish*, 460 A.2d at 42. There was also the precedent of *Campbell v. United States*, 450 A.2d 428, 431 n.5 (D.C. 1982) (citation omitted), stating that the mental state requirement of threats is "that the defendant intended to utter the words which constituted the threat" (repeated in *Evans v. United States*, 779 A.2d

---

(…continued)
*Blitz v. Donovan*, 740 F.2d 1241, 1245 (D.C. Cir. 1984) ("Congress is deemed to know the . . . judicial gloss given to certain language and thus adopts the existing interpretation unless it affirmatively acts to change the meaning." (alteration in original) (internal quotation marks omitted)).

[13] *Carrell v. United States*, 80 A.3d 163, 170 (D.C. 2013), *reh'g en banc granted & op. vacated*, 2015 D.C. App. LEXIS 513 (July 15, 2015) (per curiam).

891, 894 (D.C. 2001), and *Joiner-Die v. United States*, 899 A.2d 762, 764 (D.C. 2006)), decisions that controlled per *Thomas v. United States*, 731 A.2d 415, 420 n.6 (D.C. 1999).

The landscape has now changed, of course; the division decision in *Carrell* was vacated in light of *Elonis*, and the general-intent guidance of *Holt*, *Campbell*, *Evans*, and *Joiner-Die*, has been superseded (or overruled). But the point of the preceding paragraph was to describe the state of our law at the time the Council amended the threats statutes in 2013 (modifying the penalty language). The Council did not venture at that time to describe more particularly the elements of the offense or to specify a mens rea. To be sure, "subsequent legislative actions [by the Council] do not carry interpretive weight equivalent to that accorded actions of the enacting body [Congress]," *Holt*, 565 A.2d at 975, and the Council's 2013 amendments to the threats statutes pertained only to penalties, not to the elements of the offenses. So, I do not wish to overstate the point I am making. Still, the Council did not legislate in one broad stroke, but instead took care to exempt some statutes from its proportionality amendments, showing that some attention was given to each affected provision. "[A]ssum[ing] legislative awareness of the prior judicial interpretation" of our threats statutes, and "given the Council's opportunity to revise the . . . threats statute[s]" but its failure to do so, we

have some additional basis to "conclude that the D.C. Council's interpretation . . . comport[ed] with" this court's en banc interpretation in *Holt* and in the *Campbell* line of decisions (or at the very least, that the Council was not alarmed by that interpretation and did not insist on the interpretation in *Baish* and its progeny). *Holt*, 565 A.2d at 975–76.

Having determined that we must now construe our threats statutes to have a subjective mens rea element, the question we confront is the one Justice Alito framed: which mental state "[i]n the hierarchy of mental states that may be required as a condition for criminal liability" we should construe our statutes to require. *Elonis*, 135 S. Ct. at 2015 (Alito, J., concurring in part and dissenting in part). Justice Alito opined that the *Elonis* Court should stop at recklessness, "the *mens rea* just above negligence," reasoning that "when Congress does not specify a *mens rea* in a criminal statute, we have no justification for inferring that anything more than recklessness is needed." *Id.* (alteration in original) (observing that "[o]nce we have reached recklessness, we have gone as far as we can without stepping over the line that separates interpretation [of the statute] from amendment [of the statute]"). In light of this court's historical interpretation of our threats statutes discussed above, I reach the same conclusion as to §§ 22-407 and -1810.

5. <u>A recklessness standard may make a difference in case outcomes</u>. It was suggested at oral argument that it may make very little difference to the outcome of cases under our threats statutes whether the government is required to prove that the defendant knew the ordinary hearer would view the utterance as a threat or instead must prove that the defendant knew that there was a substantial likelihood the hearer would do so — and, therefore, that there is no compelling reason to hold that a mens rea of recklessness suffices for conviction. I am not so sure. The trial record in *Elonis* and the record in another recent case make me think that it sometimes will be easier to prove recklessness than the other culpable mental states.

In *Elonis*, the defendant testified that "he did not intend to make any threats." *United States v. Elonis*, 841 F.3d 589, 595 (3d Cir. 2016). However, when asked about how he thought people might interpret his Facebook posts (posts that, *inter alia*, asked his wife whether the protection order she had obtained was "thick enough to stop a bullet," warned that Elonis had "enough explosives to take care of the state police and the Sheriff's Department," and stated that Elonis had "had about enough" and was "making a name for him[self]" just before referring to "[e]nough elementary schools in a ten-mile radius to initiate the most heinous school shooting ever imagined"), Elonis responded, "You know, I didn't really

care about what other people thought." *Id.* at 594–95. Similarly, in *State v. Rund*, No. A16-0133, 2017 Minn. LEXIS 330 (Minn. June 7, 2017), the defendant "admitted that he posted . . . five threatening tweets" but "claimed that he did not make the threats with an intent to terrorize." *Id.* at \*3. However, he also "admitted that he posted the tweets recklessly, without regard to the risk of causing terror." *Id.* at \*3–4. In *Elonis*, the Third Circuit concluded that there was "overwhelming evidence demonstrating beyond a reasonable doubt that [the defendant] knew the threatening nature of his communications," 841 F.3d at 598,[14] and Rund entered a guilty plea, but it seems reasonable to think that such circumstances will not always exist. In some cases, the evidence that the defendant "didn't really care about what other people thought" or "posted . . . recklessly" might be the critical evidence supporting conviction.

6. <u>The issue of recklessness as the requisite mens rea has been fully briefed, and we should decide it now</u>. Further, unlike the Supreme Court in *Elonis*, we have the benefit of substantial briefing by the parties and *amici* on the issue of whether a mens rea of recklessness suffices for conviction under §§ 22-407 and 22-

---

[14] The Third Circuit had no difficulty applying (though not adopting) a recklessness standard on remand in *Elonis*. 841 F.3d at 598. It concluded that "under either standard" — a recklessness standard or a knowledge standard — the District Court's error in instructing the jury under only an objective standard was harmless. *Id.*

1810. I believe we now have a "duty . . . to say what the law is," *Elonis*, 135 S. Ct. at 2014 (Alito, J., concurring in part and dissenting in part), so that our trial judges will have the benefit of our analysis in deciding the many threats cases that come before them.

Notably, by my rough estimate (derived by looking at the numbers of reported cases from the federal circuit courts of appeals and our court), our trial court encounters threats cases with a great deal more frequency than their Article III federal-court counterparts. There are sixty-five published opinions of this court involving convictions under our threats statutes, compared to fewer than 400 reported cases from all of the federal circuits mentioning 18 U.S.C. § 875 (c), for an average of fewer than thirty-five cases per circuit. Thus, by my estimate, we are called upon to decide about twice as many threats (or attempted threats) cases as our federal appellate counterparts, and this does not include the many cases that we decide by unpublished memorandum opinions. This does not, of course, account for matters that come before our trial court but do not result in appeals to this court. The statistics suggest to me that our trial court handles a significantly larger volume of threats cases than federal trial courts do. The federal circuit courts of appeals may have the luxury of waiting indefinitely for one of them to step forward and decide whether recklessness suffices for conviction under 18 U.S.C. § 875 (c),

but my assessment is that we do not enjoy that luxury with respect to our threats statutes.

Further, although the United States disclaims an intent to prosecute future threats cases under a recklessness theory, both it and amicus DVLEAP urge us to interpret the threats statutes to require recklessness as the minimum mens rea, and Mr. Carrell and amicus Public Defender Services urge us to conclude that recklessness does not suffice. Thus, the issue has been squarely joined. Further, while we have not heard from the District of Columbia, we know (from *S.W.*, for example) that it prosecutes juvenile offenders on charges of threats or attempted threats, and we cannot assume that it intends not to prosecute under a recklessness theory. However we decide the issue of whether recklessness suffices for conviction, we should reach the issue now.

7. The objective, actus reus element of threats sufficiently safeguards First Amendment rights. "It is settled that the Constitution does not protect true threats[,] [a]nd there are good reasons for that rule," i.e., that "[t]rue threats inflict great harm and have little if any social value." *Elonis*, 135 S. Ct. at 2016 (Alito, J., concurring in part and dissenting in part). But speech can be "a true threat and therefore unprotected under the Constitution [only] if an ordinary reasonable

recipient who is familiar with the context of the statement would interpret it as a serious expression of an intent to cause a present or future harm." *S.W.*, 45 A.3d at 156 (internal quotations marks, footnotes, and brackets omitted). "[C]ourts have struck threats convictions on First Amendment grounds where facially threatening language placed in context cannot reasonably be perceived as a threat" and "have held that arrests based on statements that are not objectively threatening violate the First Amendment." *Id*. at 156–57 (citations omitted).

The actus reus elements of threats — the objective test of whether "an ordinary reasonable recipient who is familiar with the context of the statement would interpret it as a serious expression of an intent to cause a present or future harm[,]" *id.* at 156 (internal quotation marks, brackets, and footnotes omitted) — "shields individuals from culpability for communications that are not threatening to a reasonable person, distinguishing true threats from hyperbole, satire, or humor," or mere artistic expression. *Elonis*, 841 F.3d at 596–97; *see also United States v. Jeffries*, 692 F.3d 473, 480 (6th Cir. 2012) (The objective standard "winnows out protected speech because, instead of ignoring context, it forces jurors to examine the circumstances in which a statement is made."). That being the case, I see no reason why we should not implement our threats statutes "to the fullest extent possible," *Blitz*, 740 F.2d at 1246 (citation omitted), by recognizing

that a true threat made recklessly, i.e., with awareness and conscious disregard of the substantial and unjustifiable risk that the words communicated will be perceived as a serious expression of an intent to do bodily injury, is punishable under our threats statutes. That is especially so given what amicus DVLEAP tells us are the "serious and long-lasting psychological and emotional consequences" of threats.

**

For all the foregoing reasons, my view is that the en banc court should have reached the issue and should hold that a defendant may be convicted under D.C. Code §§ 22-407 or -1810 if he consciously disregards a substantial and unjustifiable risk that his utterance will be perceived as a threat. In that we have not reached that conclusion, our trial judges should do so (and they remain free to do so) and should enter guilty verdicts (or instruct the jury of its duty to do so) when the evidence establishes beyond a reasonable doubt that the defendant recklessly communicated a threat, even if the evidence falls short of establishing that the defendant intended the communication as a threat or knew that it would be perceived as a threat.